THE LAW FIRM FOR TRUCK SAFETY, LLP
Grant H. Lawson, WY State Bar No. 6-4260
Joseph P. Chenchar, WY State Bar No. 7-5576
1551 Three Crowns Drive, Ste. 100
Casper, WY 82604
Telephone: (307) 301-2885
Grant@truckaccidents.com
Jchenchar@truckaccidents.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

**SHARON K. LENGYEL**, Individually and as Wrongful Death Representative for the Estate of **JOHN HOWARD LENGYEL**

Plaintiff,

vs.

**WALMART INC., a Delaware Corporation; WAL-MART TRANSPORTATION, LLC**, a Delaware Limited Liability Company; and **HERBERT SMITH**, an individual; **NOVA LINES, INC.**, an Illinois Corporation; **GLADIUS LEASING, LLC**, an Illinois Limited Liability Company; **ALLECTUS LEASING, INC.**, an Illinois Corporation; **LUIS SALDIVAR**, an individual; **ORIGIN TRANSPORT, LLC.**, an Idaho Corporation; **PENSKE TRUCK LEASING, CO., L.P.**, a Delaware Limited Partnership; **DAMON TOMLIN**, an individual; and **John Does I-X**, **Jane Does I-X** and **ABC Corporations I-X**

Defendants.

Case No. ____________________

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff, by and through her undersigned attorneys, and for her Complaint against Defendants hereby states and alleges the following:

## OVERVIEW

1. This case arises out of a tragic and preventable accident which happened at approximately 3:00 p.m. on February 18, 2026, on Interstate 80 at about Milepost Marker 18.9 in Uinta County, Wyoming.

2. Plaintiff Sharon Lengyel and her husband, John Lengyel, had come to a complete stop in the left lane in their Chevy Silverado due to a crash ahead of them.

3. They were struck first by an Origin Transport, LLC tractor-trailer operated by Damon Tomlin, who jackknifed his tractor-trailer, with the tractor blocking the left-hand lane.

4. The Walmart tractor-trailer operated by Herbert Smith crashed through the jackknifed tractor of the Origin Transport, LLC tractor-trailer, the force of which caused the Lengyels' stationary truck to spin into the right-hand lane.

5. John Lengyel rolled down his window to wipe debris off the windshield, when they were hit again by a Nova Lines, Inc. tractor-trailer operated by Luis Saldivar with such velocity that Mr. Lengyel was ejected from the vehicle and was crushed between the side of his Chevy and the front left wheel of the Nova Lines, Inc. tractor-trailer.

6. Plaintiff Sharon Lengyel, as wrongful death representative for her husband, John Lengyel (deceased), sues the Defendants for John Lengyel's wrongful death, and for her causes of action states as follows:

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff Sharon Lengyel, wife of decedent John Lengyel (or "Plaintiff"), is a domiciliary and citizen of the State of Ohio, residing in Lorain County, Ohio. She brings this wrongful death action on behalf of herself and on behalf of all of the statutory beneficiaries

pursuant to Wyoming law. At the time of his death, John Lengyel was a domiciliary and citizen of the State of Ohio.

8. Sharon Lengyel was appointed as the Personal Representative of the Estate of John Lengyel. See Exhibit 1, attached.

9. Sharon Lengyel brings these claims on her behalf and on behalf of all the beneficiaries of John Lengyel for all damages available at law or equity for all related wrongful death claims.

10. Defendant Wal-Mart Transportation, LLC ("Wal-Mart Transportation") is a Delaware Limited Liability Company organized and existing under the laws of the State of Delaware, with its principal place of business located in Bentonville, Arkansas. Wal-Mart Transportation's headquarters is located at 805 Respect Drive, Bentonville, Arkansas. Wal-Mart Transportation regularly conducts business in the State of Wyoming and does business across the United States. Wal-Mart Transportation may be served at its registered agent in the State of Wyoming, CT Corporation System, 2232 Dell Range Blvd, Suite 200, Cheyenne, WY 82009.

11. Defendant Wal-Mart Transportation is Delaware Limited Liability Company engaged in the nationwide business of interstate trucking; it is a motor carrier regulated by the Federal Motor Carrier Safety Administration to operate commercial motor vehicles for profit throughout the United States, including the State of Wyoming, with the USDOT #63585 and Motor Carrier #MC-311233.

12. Defendant Wal-Mart Transportation regularly conducts business in Wyoming, including, but not limited to regular truck routes, shipment routes, and movement of cargo within Wyoming on public roadways using both owned and non-owned equipment including truck

tractors and trailers.

13. Defendant Wal-Mart Transportation was listed as the registered owner of the 2024 Freightliner Tractor ("Walmart Truck") with VIN 3AKJHHDR7RSUT5028, operated by Herbert Smith at the time of this incident.

14. Upon information and belief, the Walmart Truck was towing a trailer also owned by Wal-Mart Transportation. Defendant Wal-Mart Transportation was listed as the registered owner of the 2021 Great Dane trailer ("Walmart Trailer") with VIN 1GR1A0624MJ304805 which was towed by Herbert Smith at the time of the incident.

15. The Walmart Truck and aforementioned Walmart trailer may be described herein as the "Walmart CMV."

16. Upon information and belief Defendant Wal-Mart Transportation is a wholly owned subsidiary of Defendant Walmart Inc.

17. Defendant Walmart Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bentonville, Arkansas. Walmart Inc. is the sole parent company of, and exercises ownership and control over, Defendant Wal-Mart Transportation, LLC. Upon information and belief, Walmart Inc. establishes, directs, and controls the safety policies, training programs, operational standards, and regulatory compliance functions applicable to Wal-Mart Transportation, LLC and its drivers, and derives direct financial benefit from the motor carrier operations conducted through Wal-Mart Transportation, LLC.

18. Defendant Walmart Inc. regularly conducts business in the State of Wyoming including, but not limited to, an extensive statewide brick-and-mortar retail and distribution footprint. Walmart Inc. may be served at its registered agent in the State of Wyoming, CT

Corporation System, 2232 Dell Range Blvd, Suite 200, Cheyenne, WY 82009.

19. On information and belief, Wal-Mart Transportation has been used as a mere instrumentality for the transaction of Walmart Inc.'s own affairs and there is such unity of interest in ownership that the separate personalities of the corporations no longer exists. The closely intertwined and alter ego relationship between Walmart Inc. and Wal-Mart Transportation requires recognizing the substance of the relationship over the form because the corporate fiction distinguishing between Walmart Inc. and Wal-Mart Transportation.

20. Defendants Wal-Mart Transportation, LLC and Walmart, Inc. are collectively referred to herein as "Walmart." Where allegations are directed to "Walmart," they are intended to apply to each of these Defendants individually and collectively.

21. On information and belief, Defendant Herbert Smith ("Smith") was and is a domiciliary and citizen of Utah and maintains a residence at 5443 W, 5400 S, Salt Lake City, Utah, 84118. As a long-haul truck driver, he travels throughout the United States including frequently through the State of Wyoming, including at the time the subject incident occurred. On information and belief, Defendant Smith entered an arrangement with Walmart to transport cargo in interstate commerce in the State of Wyoming, was trained, supervised and monitored on interstate routes and was directly involved in the incident in the State of Wyoming that forms the basis of the Plaintiff's claims.

22. Defendant Nova Lines, Inc. ("Nova") is an Illinois Corporation with its principal place of business located in Bridgeview, Illinois. Nova's headquarters is located at 8535 S 77th Ave., Bridgeview, Illinois 60455. Nova regularly conducts business in the State of Wyoming and does business across the United States. Nova has consented to jurisdiction in the State of Wyoming

and may be served through its appointed statutory BOC-3 agent for service of process, TRUCK PROCESS AGENTS OF AMERICA, INC., c/o E-Z Prorate, 770 E Collins Dr., Casper, Wyoming 82601, c/o Sally Adams-Reinhart, as required by 49 C.F.R. § 366.

23. Defendant Nova is an Illinois Corporation engaged in the nationwide business of interstate trucking and brokering; it is a motor carrier and broker licensed and regulated by the Federal Motor Carrier Safety Administration to operate commercial motor vehicles and broker freight for profit throughout the United States, including the State of Wyoming, with the USDOT #2559423 and Motor Carrier #MC-892806.

24. Defendant Nova regularly conducts business in Wyoming, including, but not limited to regular truck routes, shipment routes, and movement of cargo within Wyoming on public roadways using both owned and non-owned equipment including truck tractors and trailers.

25. Defendant Allectus Leasing, Inc. ("Allectus") was listed as the registered owner of the 2025 Freightliner Tractor ("Nova Truck") with VIN 3AKJHHDR4SSVP9545, operated by Luis Saldivar at the time of this incident. Upon information and belief, Allectus' address is 118 S County Line Road, Hinsdale, Illinois 60521. Allectus' registered agent, Tomasz Koziol, may be served at 1701 E. Lake Ave., Suite 170, Glenview, Illinois 60025-2085.

26. Upon information and belief, the Nova Truck was towing a trailer owned by Defendant Gladius Leasing, LLC ("Gladius"). Defendant Gladius was listed as the registered owner of the 2025 East Manufacturing Corp. trailer ("Nova Trailer") with VIN 1E1H5Y282SR088220 which was towed by Luis Saldivar at the time of the incident. Upon information and belief, Gladius' address is 8535 S 77th Ave., Bridgeview, Illinois 60455. Gladius' registered agent, Incorporating Services, Ltd., may be served at 901 S. 2nd Street, Suite 201,

Springfield, Illinois 62704-7909.

27. The Nova Truck and aforementioned trailer may be described herein as the "Nova CMV."

28. On information and belief, Defendant Luis Saldivar ("Saldivar") was and is a domiciliary and citizen of Arizona and maintains a residence at 21971 W Papago St., Buckeye, Arizona 85326-8685. As a long-haul truck driver, he travels throughout the United States including frequently through the State of Wyoming, including at the time the subject incident occurred. On information and belief, Defendant Saldivar entered an arrangement with Nova, Gladius and Allectus to transport cargo in interstate commerce in the State of Wyoming, was trained, supervised and monitored on interstate routes and was directly involved in the incident in the State of Wyoming that forms the basis of the Plaintiff's claims.

29. Defendant Origin Transport, LLC ("Origin") is an Idaho Limited Liability Company with its principal place of business located in Idaho Falls, ID. Origin's headquarters is located at 6030 S Yellowstone Hwy, Idaho Falls, ID 83402. Origin regularly conducts business in the State of Wyoming and does business across the United States. Origin has consented to jurisdiction in the State of Wyoming and may be served through its appointed statutory BOC-3 agent for service of process, Process Agent Service Company, Inc., c/o Day & Night Process Serving, LLC, c/o Julie Gliem, 1805 Warren Ave, Cheyenne, Wyoming 82001, as required by 49 C.F.R. § 366.

30. Defendant Origin is an Idaho limited liability company engaged in the nationwide business of interstate trucking; it is a motor carrier regulated by the Federal Motor Carrier Safety Administration to operate commercial motor vehicles for profit throughout the United States,

including the State of Wyoming, with the USDOT #3167816 and Motor Carrier #MC-115839.

31. Defendant Origin regularly conducts business in Wyoming, including, but not limited to regular truck routes, shipment routes, and movement of cargo within Wyoming on public roadways using both owned and non-owned equipment including truck tractors and trailers.

32. Defendant Origin was listed as the registered owner of the 2023 Kenworth Tractor ("Origin Truck") with VIN 1XKYD49X6PJ240967, operated by Damon Tomlin at the time of this incident.

33. Upon information and belief, the Origin Truck was towing a trailer owned by Defendant Penske Truck Leasing, Co., L.P. ("Penske"). Defendant Penske is a Delaware Limited Partnership. Defendant Penske was listed as the registered owner of the Utility Trailer Manufacturing Company trailer ("Origin Trailer") with VIN 1UYVS2536R2096119 which was towed by Damon Tomlin at the time of the incident. Upon information and belief, Penske's address is 2675 Morgantown Road, Reading, Pennsylvania 19607. Penske's registered agent in the state of Wyoming, may be served at Corporation Service Company, 1821 Logan Ave., Cheyenne, WY 82001.

34. The Origin Truck and aforementioned Penske trailer may be described herein as the "Origin CMV."

35. On information and belief, Defendant Damon Tomlin ("Tomlin") was and is a domiciliary and citizen of Idaho and maintains a residence at 2195 Stace Street, Idaho Falls, Idaho 83401. As a long-haul truck driver, he travels throughout the United States including frequently through the State of Wyoming, including at the time the subject incident occurred. On information and belief, Defendant Tomlin entered an arrangement with Origin and Penske to transport cargo

in interstate commerce in the State of Wyoming, was trained, supervised and monitored on interstate routes and was directly involved in the incident in the State of Wyoming that forms the basis of the Plaintiff's claims.

36. Defendants are all separately comparatively negligent for their own, separate negligent acts and/or omissions.

37. John Does I-X, Jane Does I-X and ABC Corporations I-X are persons, partnerships, corporations or unincorporated associates subject to suit in a common name whose names are unknown to Plaintiff and are therefore designated by fictitious names. Plaintiff will ask leave of Court to substitute the true names of the said parties prior to the entry of Judgment herein, who are wholly or partially responsible for the acts complained of.

## DEFINITIONS

38. Whenever a defendant is referenced, such term is intended to include all agents or employees for which such defendant would be liable under agency/master-servant/vicarious liability/joint-venture.

39. All named defendants may be referred collectively as "Defendants" for ease of reference.

40. Whenever the term "Plaintiff[s]" is used it is intended to include both Sharon K. Lengyel in an individual capacity and in her representative capacity on behalf of John Lengyel, deceased, his Estate, and on behalf of all statutory beneficiaries.

## JURISDICTION AND VENUE

41. There is complete diversity between Plaintiff and Defendants, and the matter in controversy greatly exceeds, exclusive of interest and costs, the sums specified by 28 U.S.C. §

1332.

42. The events at issue took place within of Uinta County, Wyoming. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

## FACTUAL ALLEGATIONS

### *ORIGIN TRANSPORT, LLC SAFETY HISTORY*

43. Defendant Origin Transport LLC ("Origin") is an Idaho limited liability company authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as an interstate for-hire motor property common carrier under USDOT Number 3167816 and Motor Carrier Number MC-115839.

44. Origin operates a fleet of approximately 34 power units and employs approximately 35 commercial motor vehicle ("CMV") drivers to transport general freight, fresh produce, meat, and refrigerated food in interstate commerce.

45. As a motor carrier operating CMVs in interstate commerce, Origin is subject to the Federal Motor Carrier Safety Regulations ("FMCSRs") codified at 49 C.F.R. Parts 350–399, including but not limited to Part 382 (Controlled Substances and Alcohol Use and Testing), Part 391 (Qualifications of Drivers and Longer Combination Vehicle [LCV] Driver Instructors), Part 392 (Driving of Commercial Motor Vehicles), Part 393 (Parts and Accessories Necessary for Safe Operation), Part 395 (Hours of Service of Drivers), and Part 396 (Inspection, Repair, and Maintenance).

46. Under federal law, Origin bore a non-delegable duty to ensure that its drivers were qualified to operate CMVs, that its vehicles were maintained in safe operating condition, that its drivers complied with hours-of-service limitations, and that its operations conformed to all

applicable FMCSRs. 49 C.F.R. §§ 390.11, 391.11, 396.3, 396.7.

47. As of the date of the crash made the basis of this action, the FMCSA had never conducted a compliance review of Origin and Origin held no federal safety rating. The absence of a safety rating means Origin's internal safety management systems had never been subjected to federal audit or evaluation.

48. Origin was granted property broker authority on October 8, 2020, which authority was revoked on February 26, 2021 – approximately five months after grant – for reasons characterized as "Voluntary Revocation." The associated broker trust fund was cancelled effective March 31, 2021. As of the date of the crash, Origin's broker authority remained inactive. Upon information and belief, the rapid revocation of broker authority reflects regulatory or financial deficiencies in Origin's operations during the relevant period.

## ***ORIGIN'S DRIVER OUT-OF-SERVICE RATE AND FLEET-WIDE SAFETY DEFICIENCIES***

49. During the 24-month period ending February 27, 2026, Origin's vehicles and drivers were subjected to 85 roadside inspections conducted by federal and state enforcement officers under the North American Standard Inspection Program.

50. Of those 85 inspections, **50 inspections (58.8%) resulted in documented safety violations** used in the FMCSA's Safety Measurement System ("SMS"). Origin's drivers and vehicles accumulated a total of 97 violations across all Behavior Analysis and Safety Improvement Categories ("BASICs") during this period.

51. Origin's Driver Out-of-Service ("OOS") rate during the 24-month measurement period was **9.5%**, meaning that nearly one in every ten driver inspections resulted in an

enforcement officer finding the driver so unfit or so far out of compliance that the driver was ordered to cease operating immediately. The national average Driver OOS rate during the same period was 6.4%. Origin's Driver OOS rate was therefore approximately 48% higher than the national average.

52. The elevated Driver OOS rate reflects a systemic and carrier-wide failure to ensure that Origin's drivers were qualified, properly credentialed, and in compliance with hours-of-service and driver fitness regulations before being dispatched to operate CMVs on the nation's highways.

## ***<u>ORIGIN'S PATTERN OF NEGLIGENT HIRING</u>***

### ***Duty to Screen and Qualify Drivers***

53. Under 49 C.F.R. § 391.11, a motor carrier shall not employ a driver unless the driver meets certain minimum qualifications, including possession of a valid commercial driver's license ("CDL") for the type of vehicle to be operated. Under 49 C.F.R. § 391.23, a motor carrier must, within 30 days of employing a driver, investigate the driver's employment history, driving record, and safety performance history for the preceding three years. Under 49 C.F.R. § 391.21, a motor carrier must require every applicant for employment as a driver to complete an application that includes the applicant's accident and violation history.

### ***Origin's Failure to Verify CDL Status***

54. On or about May 12, 2025, a driver operating a CMV under Origin's authority was inspected and found to be operating without a valid commercial driver's license, in violation of 49 C.F.R. § 383.23(a)(2). The driver was placed out of service. This violation carries a severity weight of 8 (on a scale of 1-10) plus a 2-point OOS penalty under the FMCSA's SMS methodology,

reflecting its seriousness.

55. During the same inspection, the same driver was found to be operating without a valid medical examiner's certificate, in violation of 49 C.F.R. § 391.41(a). This constituted a separate out-of-service violation.

56. A pre-employment check of the driver's motor vehicle record ("MVR") and CDL status – which Origin was required to perform under 49 C.F.R. §§ 391.21-391.23 – would have revealed the absence of a valid CDL and medical certificate. Origin either failed to conduct the required pre-employment screening or conducted the screening and ignored a disqualifying result. In either event, Origin placed a driver behind the wheel of a CMV weighing in excess of 26,001 pounds without verifying the driver's most basic legal qualification to operate it.

***Origin's Employment of a Disqualified Driver***

57. On or about November 9, 2024, a driver operating a CMV under Origin's authority was inspected and found to be driving a CMV while disqualified, specifically, the driver's license had been suspended for a safety-related or unknown reason in a state other than the driver's state of issuance. This constituted a violation of 49 C.F.R. § 391.15(a), which prohibits any motor carrier from requiring or permitting a disqualified driver to operate a CMV. The driver was placed out of service.

58. Under 49 C.F.R. § 391.25, Origin was required to make an annual inquiry into the driving record of each driver it employed to ascertain whether the driver met minimum qualifications. Under 49 C.F.R. § 391.25, each driver was required to furnish Origin with a list of all violations of motor vehicle traffic laws annually. The fact that a disqualified driver was operating an Origin CMV on the public highways demonstrates that Origin either failed to conduct

the required annual inquiry, failed to review the results of the inquiry, or affirmatively disregarded a disqualifying result.

59. These Driver Fitness violations are not isolated incidents attributable to a single rogue employee. They reflect a systemic failure in Origin's hiring and driver qualification systems – corporate-level decisions and omissions that placed unqualified and disqualified individuals behind the wheels of heavy commercial vehicles traveling at highway speeds among the motoring public.

## ***ORIGIN'S PATTERN OF NEGLIGENT RETENTION***

### ***Pattern of HOS Violations and Falsified Records***

60. During the 24-month measurement period, Origin's drivers accumulated 21 inspections resulting in Hours-of-Service ("HOS") violations, yielding an HOS Compliance BASIC measure of 2.18. The nature and frequency of these violations demonstrate a carrier-wide pattern of HOS noncompliance that Origin knew or should have known about and failed to correct.

61. On at least seven separate occasions between August 19, 2024 and February 24, 2026, Origin drivers were cited for making false reports in connection with their records of duty status, in violation of 49 C.F.R. § 395.8(e). A false record of duty status is not a technical or inadvertent paperwork error – it is an affirmative misrepresentation designed to conceal the driver's true hours of service, typically to mask driving-time violations that would otherwise require the driver to cease operating.

62. On or about February 24, 2026 – just six days after the crash made the basis of this action – an Origin driver was cited under 49 C.F.R. § 395.8(e) for producing a false record of duty status that concealed an HOS limitation violation. This was classified as an out-of-service

violation. This violation, occurring within days of the subject crash, demonstrates that the carrier's culture of log falsification was active and ongoing at the time of the collision.

63. On at least three occasions, Origin drivers were cited for improper use of the Personal Conveyance exception (49 C.F.R. § 395.8(e)(1)PC), a recognized method of concealing on-duty driving time by mischaracterizing compensated operations as personal travel.

64. On at least three occasions, Origin drivers were cited for driving more than 11 hours following 10 consecutive hours off duty, in violation of 49 C.F.R. § 395.3(a)(1). On at least four occasions, Origin drivers were cited for driving beyond the 14-hour on-duty period, in violation of 49 C.F.R. § 395.3(a)(2). Multiple instances resulted in out-of-service orders.

65. Each roadside inspection resulting in a violation generates a report that is transmitted to both the FMCSA and the motor carrier. Origin therefore received direct notice of each of these violations. The FMCSA's publicly accessible Safety Measurement System compiles and publishes these violations, which are available to the carrier in real time. Despite this continuous and cumulative notice of systemic HOS noncompliance and record falsification across its fleet, Origin continued to employ and dispatch the offending drivers without demonstrable corrective action. No FMCSA enforcement penalties appear in Origin's record, suggesting no voluntary compliance measures were taken.

***Origin's Pattern of Unsafe Driving Violations***

66. During the same 24-month period, Origin drivers were cited for unsafe driving violations at 21 inspections, yielding an Unsafe Driving BASIC measure of 5.07. These violations included speeding 15 or more miles per hour over the posted limit on four occasions (carrying a severity weight of 10 – the maximum); speeding 11-14 mph over the limit on two occasions;

speeding 6-10 mph over the limit on six occasions; failure to obey a traffic control device on four occasions; improper lane change on two occasions; following too closely on one occasion; and failure to use a seatbelt on two occasions.

67. The investigating officer in the crash made the basis of this action found that Origin's driver, Defendant Damon M. Tomlin, was "driving too fast for conditions" on an icy roadway in snowing conditions. The carrier's documented tolerance of chronic and extreme speeding violations across its fleet – including the most severe category – over an extended period demonstrates that Origin knew or should have known that its drivers habitually operated at unsafe speeds and nevertheless retained and continued to dispatch them.

## ***ORIGIN'S PATTERN OF NEGLIGENT SUPERVISION***

### ***Failure to Implement and Enforce ELD Compliance***

68. Since December 18, 2017, motor carriers subject to the FMCSRs have been required to ensure that their drivers use Electronic Logging Devices ("ELDs") to record their hours of service in accordance with 49 C.F.R. Part 395, Subpart B. The ELD mandate was enacted specifically to prevent the falsification of drivers' records of duty status – the very practice Origin's drivers engaged in repeatedly.

69. Origin's SMS profile reveals a broad pattern of ELD noncompliance, including but not limited to: failure to mount portable ELDs in a fixed position visible to the driver (49 C.F.R. § 395.22(g)); failure to maintain ELD instruction sheets describing data transfer mechanisms (49 C.F.R. § 395.22(h)(2)); failure to maintain blank RODS graph-grids (49 C.F.R. § 395.22(h)(4)); ELD form-and-manner violations (49 C.F.R. § 395.24); failure to manually input or verify trailer numbers (49 C.F.R. § 395.24(c)(2)(ii)); failure to add shipping document numbers (49 C.F.R. §

395.24(c)(2)(iii)); failure to produce and transfer ELD records to authorized safety officials upon request (49 C.F.R. § 395.24(d)); and failure to review and certify the accuracy of ELD-gathered information (49 C.F.R. § 395.30(b)(1)).

70. Under 49 C.F.R. § 395.8(a)(1), the motor carrier bears responsibility for ensuring each of its drivers' records duty status. The breadth, repetition, and variety of ELD violations across multiple Origin drivers and inspections demonstrate that Origin did not implement, enforce, or monitor an ELD compliance program. This is a supervisory failure at the corporate level that facilitated the very driving-time concealment and HOS abuse documented in Origin's violation history.

***Origin's Failure to Monitor and Correct Known Deficiencies***

71. Over the 24-month measurement period, 58.8% of all roadside inspections of Origin's drivers and vehicles resulted in documented violations. Origin received direct notice of each violation through inspection reports and OOS orders transmitted by enforcement agencies. Origin had continuous access to its own SMS data and BASIC measures through the FMCSA's publicly available Safety Measurement System. Despite this cumulative and unambiguous evidence of fleet-wide noncompliance, Origin failed to implement any demonstrable corrective action, including but not limited to enhanced driver training programs, disciplinary action against repeat violators, intensified pre-trip and post-trip inspection protocols, or engagement of third-party safety consultants.

72. A motor carrier exercising reasonable care in the supervision of its drivers and vehicles would have identified the pattern of violations reflected in Origin's SMS profile and taken meaningful corrective action well before the crash made the basis of this action. Origin's failure

to do so constitutes negligent supervision.

## ***ORIGIN'S PATTERN OF NEGLIGENT MAINTENANCE***

### ***Regulatory Maintenance Obligations***

73. Under 49 C.F.R. § 396.3(a), every motor carrier is required to systematically inspect, repair, and maintain all CMVs subject to its control. Under 49 C.F.R. § 396.7, no motor carrier shall permit a CMV to be driven in a condition likely to cause an accident or breakdown. Under 49 C.F.R. § 396.17, every CMV must be inspected at least once every 12 months as prescribed in 49 C.F.R. Part 396, Appendix A.

### ***Origin's Brake System Defects***

74. During the 24-month measurement period, Origin vehicles were cited for multiple brake-related violations, including: ABS malfunction lamp defective on trailers manufactured on or after March 1, 1998 (49 C.F.R. § 393.55(e)) on four separate occasions; audible air leak at other than a proper connection (49 C.F.R. § 393.45(d)), resulting in an out-of-service order; audible air leak at a proper connection (49 C.F.R. § 393.45(d)); air disc brake with contaminated friction surface (49 C.F.R. § 393.47(a)); hydraulic brake ABS defective (49 C.F.R. § 393.55(a)); and air brake hose/tubing damaged or unsecured (49 C.F.R. § 393.45(b)(2)).

75. Functioning brake systems are the single most critical safety component on a CMV, particularly when operating in winter conditions on icy roadways. Origin's documented history of dispatching vehicles with brake defects demonstrates a systemic failure in its maintenance inspection and repair program.

### ***Origin's Tire Defects***

76. Origin vehicles were cited for tire-related violations on multiple occasions, including: tread depth less than 2/32 of an inch (49 C.F.R. § 393.75(c)) on four occasions, each carrying a severity weight of 8; front tire tread depth less than 2/32 of an inch (49 C.F.R. § 393.75(b)), resulting in an out-of-service order; and tire leaking or inflation less than 50% of maximum inflation pressure (49 C.F.R. § 393.75(a)(3)), also resulting in an out-of-service order.

77. The crash that forms the basis of this action occurred on Interstate 80 in winter conditions with ice and frost on the road surface. In such conditions, tire tread depth and inflation are **directly related to the vehicle's ability to maintain traction and the driver's ability to maintain control**. Origin's repeated operation of vehicles with tires below minimum federal tread-depth requirements is directly relevant to the causation analysis in this case.

### ***Origin's Periodic Inspection Failures***

78. On at least three occasions during the measurement period, Origin vehicles were cited for operating without proof or documentation of a required periodic inspection under 49 C.F.R. § 396.17(c). This means Origin dispatched CMVs weighing in excess of 26,000 pounds onto the public highways without verifying that the vehicles had undergone the annual safety inspections required by federal law. This constitutes a direct failure of Origin's maintenance management system under 49 C.F.R. § 396.3.

### ***The Origin Crash Vehicle's Prior Violation History***

79. The Kenworth tractor involved in the subject crash bore Idaho license plate BH8171 (VIN 1XKYD49X6PJ240967). FMCSA inspection records reveal that this **specific vehicle** was involved in multiple prior inspections resulting in violations during the measurement

period, including: windshield damage and ABS defects (February 4, 2026 – just 14 days before the crash); tire tread depth below 2/32 of an inch (January 28, 2025); brake air leak (December 11, 2024); and tire tread depth below 2/32 of an inch (July 30, 2024). Origin had direct notice that the vehicle it assigned to Defendant Tomlin for the trip that ended in the fatal crash had a documented history of maintenance deficiencies.

***ORIGIN'S PATTERN OF NEGLIGENT ENTRUSTMENT***

80. Origin entrusted the operation of a 2023 Kenworth CBE tractor (VIN 1XKYD49X6PJ240967) pulling at least one trailer to Defendant Damon M. Tomlin for the purpose of transporting cargo in interstate commerce on the trip that resulted in the crash made the basis of this action.

81. At the time of entrustment, Origin knew or in the exercise of reasonable care should have known that: (a) its fleet-wide Driver OOS rate was 48% above the national average, reflecting systemic driver qualification failures; (b) its drivers routinely violated HOS limits and falsified their records of duty status; (c) it had previously employed at least one driver operating without a valid CDL and at least one driver operating while disqualified; (d) the specific tractor assigned to Tomlin (plate BH8171) had a documented history of maintenance deficiencies, including an ABS defect identified just 14 days before the crash; and (e) the crash tractor was being dispatched onto Interstate 80 in winter conditions known to include ice, snow, and reduced visibility.

82. Despite this actual and constructive knowledge, Origin entrusted the operation of a CMV with a gross vehicle weight in excess of 26,000 pounds to Tomlin and dispatched that vehicle onto a roadway where conditions demanded the highest degree of vehicle integrity and driver competence. Origin's decision to entrust this vehicle to this driver under these conditions was

negligent.

***<u>ORIGIN'S POST-CRASH DRUG AND ALCOHOL TESTING FAILURE</u>***

83. Under 49 C.F.R. § 382.303(a), a motor carrier is required to test each surviving driver for alcohol and controlled substances following a crash that involves a fatality. The crash made the basis of this action resulted in the death of John Lengyel, triggering the mandatory post-crash testing obligation for all CMV drivers involved.

84. The investigating officer's crash report reflects that **no alcohol test and no drug test was performed** on Defendant Tomlin (Suspect Alcohol: No; Alcohol Test Type: No Test Performed; Suspect Drugs: No; Drug Test Type: No Test Performed). Upon information and belief, Origin failed to ensure that post-crash drug and alcohol testing of Tomlin was conducted within the timeframes required by 49 C.F.R. § 382.303(a) – eight hours for alcohol and thirty-two hours for controlled substances.

85. The failure to conduct mandatory post-crash testing constitutes an independent violation of the FMCSRs and deprives Plaintiffs and the trier of fact of evidence directly relevant to whether Tomlin was operating the Origin CMV under the influence of alcohol or controlled substances at the time of the crash. Under applicable legal principles, Origin's failure to conduct the required testing supports an adverse inference that the results of such testing would have been unfavorable to Origin.

***<u>ORIGIN'S PRIOR CRASH HISTORY</u>***

86. During the 24-month period ending March 15, 2026, Origin was involved in three reportable crashes: one fatal crash, two injury crashes, and zero tow-away crashes. For a carrier operating 34 power units, this crash frequency is significant.

87. On or about January 25, 2026 – just 24 days before the crash made the basis of this action – an Origin vehicle bearing plate AN3411 was involved in a crash in Indiana that resulted in at least one injury. Upon information and belief, Origin was on notice of this crash and its circumstances at the time it dispatched Tomlin on the trip that culminated in the February 18, 2026 collision. Discovery will establish whether Origin took any corrective action – including enhanced safety protocols, driver retraining, or vehicle inspections – in response to the January crash, and whether the January crash involved the same driver or the same vehicle as the February crash.

88. On or about March 26, 2025, an Origin vehicle bearing plate RP01279 was involved in a crash in North Carolina that resulted in at least one injury.

89. Origin's involvement in three crashes, including a fatality, within a 24-month period, combined with the pervasive safety violations documented herein, establishes that Origin was operating with a pattern of safety failures that it knew or should have known created an unreasonable risk of serious injury or death to others sharing the roadway.

## ***NOVA LINES, INC. SAFETY HISTORY***

90. Defendant Nova Lines Inc. ("Nova") is an Illinois corporation authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as an interstate for-hire motor property common carrier under USDOT Number 2559423 and Motor Carrier Number MC-892806.

91. Nova's principal place of business is located at 8535 South 77th Avenue, Bridgeview, Illinois 60455. Nova operates a fleet of approximately 1,427 power units and employs approximately 1,427 commercial motor vehicle ("CMV") drivers to transport general freight, metal (sheets, coils, rolls), logs, poles, beams, lumber, and building materials in interstate

commerce. Nova reported annual mileage of approximately 19,000,214 miles for the year 2024.

92. As a motor carrier operating CMVs in interstate commerce, Nova is subject to the Federal Motor Carrier Safety Regulations ("FMCSRs") codified at 49 C.F.R. Parts 350–399, including but not limited to Part 382 (Controlled Substances and Alcohol Use and Testing), Part 391 (Qualifications of Drivers), Part 392 (Driving of Commercial Motor Vehicles), Part 393 (Parts and Accessories Necessary for Safe Operation), Part 395 (Hours of Service of Drivers), and Part 396 (Inspection, Repair, and Maintenance).

93. Under federal law, Nova bore a non-delegable duty to ensure that its drivers were qualified to operate CMVs, that its vehicles were maintained in safe operating condition, that its drivers complied with hours-of-service limitations, and that its operations conformed to all applicable FMCSRs. 49 C.F.R. §§ 390.11, 391.11, 396.3, 396.7.

94. As of the date of the crash made the basis of this action, the FMCSA had never conducted a compliance review of Nova and Nova held **no federal safety rating**. Despite operating a fleet of 1,427 power units, Nova's internal safety management systems had never been subjected to federal audit or evaluation.

***Nova's Prior Involuntary Revocation of Operating Authority***

95. On or about August 10, 2015, Nova's Motor Property Common Carrier authority was **involuntarily revoked** by the FMCSA. The revocation order was served on July 8, 2015, with an effective date of August 10, 2015. The FMCSA records identify the reason as "INVOLUNTARY REVOCATION." An involuntary revocation means the FMCSA revoked Nova's authority for cause – as opposed to a voluntary surrender by the carrier. Nova's authority had been granted only eight months earlier, on December 10, 2014. Nova's authority was

subsequently reinstated on August 17, 2015, seven days after the revocation took effect.

96. Upon information and belief, the involuntary revocation was prompted by regulatory deficiencies in Nova's operations, which may have included failure to maintain required insurance, failure to designate process agents, or other violations of the conditions of operating authority. Discovery will establish the specific grounds for the involuntary revocation and whether the conditions that prompted it were fully remediated or have recurred.

## ***NOVA'S VEHICLE OUT-OF-SERVICE RATE AND FLEET-WIDE SAFETY DEFICIENCIES***

97. During the 24-month period ending February 27, 2026, Nova's vehicles and drivers were subjected to 1,384 roadside inspections conducted by federal and state enforcement officers under the North American Standard Inspection Program. Of those inspections, 657 included vehicle-level inspections and 1,383 included driver-level inspections.

98. Nova's drivers and vehicles accumulated a total of 769 violations across all Behavior Analysis and Safety Improvement Categories ("BASICs") during this period. The Vehicle Maintenance BASIC alone contained 304 inspections resulting in vehicle maintenance violations.

99. Nova's Vehicle Out-of-Service ("OOS") rate during the 24-month measurement period was **30.4%** - meaning that nearly one in every three vehicle inspections resulted in an enforcement officer finding a Nova vehicle so deficient that it was ordered to cease operating immediately. The national average Vehicle OOS rate during the same period was 23.2%. Nova's Vehicle OOS rate was therefore **approximately 31% higher than the national average**. In absolute terms, **200 of 657 vehicle inspections resulted in out-of-service orders**.

100. The elevated Vehicle OOS rate reflects a systemic and carrier-wide failure to inspect, maintain, and repair Nova's fleet of 1,427 power units in compliance with 49 C.F.R. Parts 393 and 396. A carrier operating a fleet of this size at a Vehicle OOS rate 31% above the national average is dispatching defective vehicles onto the nation's highways at a scale that creates an unreasonable and foreseeable risk of serious injury or death.

## ***NOVA'S PATTERN OF NEGLIGENT MAINTENANCE***

### *Regulatory Maintenance Obligations*

101. Under 49 C.F.R. § 396.3(a), every motor carrier is required to systematically inspect, repair, and maintain all CMVs subject to its control. Under 49 C.F.R. § 396.7, no motor carrier shall permit a CMV to be driven in a condition likely to cause an accident or breakdown. Under 49 C.F.R. § 396.17, every CMV must be inspected at least once every 12 months. These obligations are non-delegable duties imposed on the carrier as an entity, independent of the conduct of any individual driver.

### *Nova's Tire Defects = Systemic Fleet-Wide Failure*

102. During the 24-month measurement period, Nova vehicles were cited for tire-related violations resulting in at least 82 out-of-service orders. These violations included: flat tires and audible air leaks (49 C.F.R. § 393.75(a)(3)) – at least 22 OOS violations, plus an additional 41 OOS violations for tires leaking or inflated to less than 50% of maximum pressure on tires not equipped with ATIS (49 C.F.R. § 393.75(a)(3)) and 18 OOS violations on tires equipped with ATIS; exposed ply or belt material (49 C.F.R. § 393.75(a)(1)) – multiple violations, several resulting in OOS orders; tread depth below 2/32 of an inch (49 C.F.R. § 393.75(c)) – seven violations; tread depth below 1/32 of an inch (49 C.F.R. § 393.75(c)) – one OOS violation; and

tire weight exceeding load limit (49 C.F.R. § 393.75(g)) – one OOS violation.

103. The crash made the basis of this action occurred on Interstate 80 in winter conditions with ice and frost on the road surface. In such conditions, tire integrity – including inflation, tread depth, and structural soundness – is directly and critically related to a vehicle's ability to maintain traction and the driver's ability to stop, steer, and maintain control. Nova's documented history of dispatching vehicles with critically deficient tires on a scale producing 82 or more tire-related OOS orders in a 24-month period demonstrates a systemic failure in its tire inspection and maintenance program.

***Nova's Brake System Defects***

104. Nova vehicles were cited for brake-related violations at a rate producing at least 13 out-of-service orders for defective brakes equaling or exceeding 20% of the service brakes on the vehicle or combination (49 C.F.R. § 396.3(a)(1)) – the threshold at which a vehicle is deemed too dangerous to operate. Additional brake violations included: audible air leaks at other than proper connections (49 C.F.R. § 393.45(d)) – five violations, four resulting in OOS; audible air leaks at proper connections (49 C.F.R. § 393.45(d)) – 12 violations; brake hose or tubing damage (49 C.F.R. § 393.45(b)(2)) – multiple violations including OOS orders; brake drum cracks opening upon brake application (49 C.F.R. § 393.47(a)) – one OOS violation; brake out-of-adjustment violations (49 C.F.R. § 393.47(e)) – 16 violations; automatic air brake adjustment systems failing to compensate for wear (49 C.F.R. § 393.53(b)) – seven violations; and inoperative brakes (49 C.F.R. § 393.48(a)) – multiple violations.

105. A properly functioning braking system is the single most critical safety component on a CMV, particularly when operating in winter conditions on an icy and snow-covered roadway

where stopping distances are substantially increased. Nova's documented pattern of dispatching vehicles with brakes so deficient that 20% or more of the service brakes are inoperative – on 13 separate occasions – demonstrates a systemic failure in Nova's brake inspection and maintenance program that created a foreseeable risk of Nova's vehicles being unable to stop safely in emergency situations.

***Nova's Cargo Securement Failures***

106. Nova transports lumber, building materials, metal coils, and other heavy cargo requiring specialized securement under 49 C.F.R. §§ 393.100-393.142. During the measurement period, Nova was cited for at least 17 OOS violations for cargo not secured to prevent leaking, spilling, blowing, or falling from the CMV (49 C.F.R. § 393.100(b)), each carrying a severity weight of 7 – among the highest in the Vehicle Maintenance BASIC. Nova was additionally cited for at least 20 OOS violations for improper securement of dressed lumber and similar building products (49 C.F.R. § 393.118(d)). Further cargo violations included insufficient tiedowns (multiple OOS), loose or unfastened tiedowns, metal coil securement failures, and heavy vehicle/equipment securement failures.

107. Unsecured or improperly secured cargo on a CMV creates a dual hazard: the cargo may shift under braking or collision forces, increasing the severity and unpredictability of any impact, and the cargo may become a projectile in a collision, striking other vehicles or persons. In a chain-reaction collision on an icy interstate involving multiple CMVs, the condition of cargo securement on each vehicle is directly relevant to the severity of resulting injuries.

***Nova's Pattern of Lighting Failures***

108. Nova vehicles were cited for multiple lighting violations resulting in OOS orders,

including at least six OOS violations for both stop lamps being inoperative when required to be on (49 C.F.R. § 393.9(a)). Additional lighting OOS violations included inoperative turn signals on the rearmost vehicle, both stop lamps obscured, and inoperative brake lamps. On a snowy, icy interstate with reduced visibility conditions, a CMV operating with no functional rear stop lamps or turn signals is invisible to following traffic during braking, creating a catastrophic risk of rear-end collision.

***Nova's Suspension, Structural, and Other Failures***

109. Nova vehicles were further cited for: deflated air suspension (49 C.F.R. § 393.207(f)) – three OOS violations; suspension connecting rod or tracking component cracked, loose, broken, or missing (49 C.F.R. § 393.207(a)) – two OOS violations at severity weight 7; wheel rim cracked more than 3 inches (49 C.F.R. § 393.205(a)) – OOS; two or more wheel rim cracks (49 C.F.R. § 393.205(a)) – OOS; wheel seal leaks – multiple OOS violations; hub bearing cap missing (49 C.F.R. § 396.3(a)(1)) – OOS; no visible lubricant in hub – OOS; and multiple fire extinguisher and emergency equipment deficiencies. This breadth of violations across multiple vehicle systems demonstrates that Nova's maintenance failures were not limited to a single deficiency category but reflected a comprehensive and systemic failure of Nova's vehicle inspection and maintenance program.

***<u>NOVA'S PATTERN OF NEGLIGENT HIRING AND RETENTION</u>***

***Employment of Drivers Without Valid CDLs***

110. On or about December 17, 2025 – approximately two months before the crash made the basis of this action – a driver operating a CMV under Nova's authority was inspected and found to be operating without a valid commercial driver's license, in violation of 49 C.F.R. §

383.23(a)(2). The driver was placed out of service. Under 49 C.F.R. § 391.11(b)(1), a motor carrier may not allow a person to operate a CMV unless that person holds a valid CDL appropriate for the vehicle type.

111. On a separate occasion on or about January 10, 2025, a Nova driver was cited for operating a CMV while not in possession of a CDL on person (49 C.F.R. § 383.23(a)(2)).

***Nova's Employment of Disqualified and Suspended Drivers***

112. On or about August 14, 2025, a driver operating a CMV under Nova's authority was found to be driving a CMV while their CDL was disqualified, in violation of 49 C.F.R. § 383.51(a). A person required to have a CDL who is disqualified must not drive a CMV under any circumstances. This violation demonstrates that Nova either failed to conduct the required inquiry into the driver's CDL status or affirmatively disregarded a disqualifying result.

113. On at least three additional occasions (January 2, 2026; May 19, 2025; and March 13, 2025), Nova drivers were cited for driving a CMV while their CDL was suspended for a non-safety-related reason outside the state of issuance (49 C.F.R. § 383.51(a)). One of these violations resulted in an out-of-service order. Under 49 C.F.R. § 391.25, Nova was required to make an annual inquiry into each driver's driving record. The repeated occurrence of suspended-CDL violations across multiple drivers and time periods demonstrates a systemic failure in Nova's driver qualification monitoring program.

***Medical Certificate Violation***

114. On or about December 30, 2025 – less than two months before the crash – a Nova driver was cited for operating a CMV without corrective lenses or a hearing aid as indicated on the driver's medical certificate, in violation of 49 C.F.R. § 391.41(b)(10). The driver was placed

out of service. This violation means a driver with a known vision or hearing limitation was operating a CMV without the required corrective devices – a failure that both the driver and the carrier had an obligation to prevent.

***NOVA'S PATTERN OF NEGLIGENT SUPERVISION: CONTROLLED SUBSTANCES AND ALCOHOL PROGRAM FAILURE***

115. Under 49 C.F.R. Part 382, every motor carrier is required to implement and maintain a controlled substances and alcohol use and testing program for its drivers. The program must include pre-employment testing, random testing, post-accident testing, and reasonable-suspicion testing. Under 49 C.F.R. § 382.501, a driver who has engaged in prohibited conduct under Part 382 must not perform safety-sensitive functions, including operating a CMV, until and unless the driver has completed the return-to-duty process.

116. During the 24-month measurement period, Nova's drivers were cited for four controlled substances and alcohol violations, all resulting in out-of-service orders:

117. On or about May 20, 2025, in Tennessee, a Nova driver was cited for operating a CMV while under the influence of drugs or with evidence of use within the past 24 hours (49 C.F.R. § 392.4(a)), a severity-weight-10 violation – the maximum. The driver was placed out of service.

118. On or about November 5, 2024, in Georgia, a separate Nova driver was cited for the same violation – operating a CMV while under the influence of drugs or with evidence of use within the past 24 hours (49 C.F.R. § 392.4(a)) – again at severity weight 10, again resulting in an out-of-service order.

119. On or about September 19, 2024, in Iowa, a Nova driver was cited for having

possession of an intoxicating beverage while on duty or in physical control of a CMV (49 C.F.R. § 392.5(a)(3)). The driver was placed out of service.

120. On or about December 12, 2024, in Tennessee, a Nova driver was cited for the same violation – possessing an intoxicating beverage while on duty or operating a CMV (49 C.F.R. § 392.5(a)(3)). The driver was placed out of service.

121. Two separate instances of a Nova driver operating a commercial motor vehicle under the influence of drugs, within a seven-month span, and two separate instances of Nova drivers possessing alcohol while on duty or operating a CMV, constitute a systemic failure of Nova's controlled substances and alcohol compliance program. These are not minor technical violations; they represent Nova drivers operating 80,000-pound vehicles on the public highways while impaired by drugs or in possession of alcohol. Under 49 C.F.R. Part 382, Nova had an affirmative obligation to implement a testing and compliance program that would prevent exactly this conduct. The recurrence of these violations across multiple drivers, multiple states, and multiple time periods demonstrates that Nova's program was ineffective, unenforced, or both.

***NOVA'S NEGLIGENT SUPERVISION: A PATTERN OF UNSAFE DIVING***

122. During the 24-month measurement period, Nova drivers were cited for unsafe driving violations at **166 inspections**. The nature and severity of these violations demonstrate a carrier-wide tolerance of extreme driving misconduct that Nova knew or should have known about and failed to correct.

***Nova's Reckless Driving***

123. On or about March 18, 2025, in Virginia, a Nova driver was convicted of reckless driving (49 C.F.R. § 392.2-SLLRD), a severity-weight-10 violation. Reckless driving is among

the most serious traffic offenses and represents a conscious and deliberate disregard for the safety of others. Nova's continued operation following this conviction without demonstrable fleet-wide corrective action demonstrates tolerance of extreme driving misconduct.

### *Cell Phone Use While Operating a CMV*

124. Nova drivers were cited for eleven violations for using a hand-held mobile telephone while operating a CMV (49 C.F.R. § 392.82 and § 392.2-SLLCP), all carrying severity weight 10. Cell phone use while operating a CMV is a federally prohibited distracted driving behavior that substantially increases crash risk. The volume of these violations – eleven in 24 months – demonstrates that Nova's drivers were routinely engaging in this prohibited behavior and that Nova's supervisory systems failed to detect or correct it.

### *Extreme Speeding*

125. Nova drivers were cited for speeding 15 or more miles per hour over the posted speed limit on ten occasions (49 C.F.R. § 392.2-SLLS4), each carrying severity weight 10. An additional four citations were issued for speeding in work/construction zones (49 C.F.R. § 392.2-SLLSWZ), also at severity weight 10. Nova drivers were further cited for speeding 11-14 mph over the limit on 15 occasions and speeding 6-10 mph over the limit on 28 occasions. The chronic and extreme nature of these speeding violations – including the highest severity category – demonstrates a fleet-wide culture of speed noncompliance.

### *Operating While Ill or Fatigued*

126. On or about January 13, 2026 – approximately five weeks before the crash made the basis of this action – a Nova driver was cited for operating a CMV while ill or fatigued (49 C.F.R. § 392.3), a severity-weight-10 violation. The driver was placed out of service. Federal law

prohibits a motor carrier from requiring or permitting a driver to operate a CMV while the driver's ability to operate safely is impaired by illness or fatigue. This violation, occurring in the weeks immediately preceding the subject crash, demonstrates that Nova was actively dispatching impaired drivers during the very period in which the subject crash occurred.

***POST-CRASH DRUG AND ALCOHOL TESTING FAILURE***

127. Under 49 C.F.R. § 382.303(a), a motor carrier is required to test each surviving driver for alcohol and controlled substances following a crash that involves a fatality. The crash made the basis of this action resulted in the death of Decedent John H. Lengyel, triggering the mandatory post-crash testing obligation for all CMV drivers involved, including Nova's driver Luis A. Saldivar.

128. The investigating officer's crash report reflects that no alcohol test and no drug test was performed on Saldivar (Suspect Alcohol: No; Alcohol Test Type: No Test Performed; Suspect Drugs: No; Drug Test Type: No Test Performed). Upon information and belief, Nova failed to ensure that post-crash drug and alcohol testing of Saldivar was conducted within the timeframes required by 49 C.F.R. § 382.303(a).

129. This failure is particularly significant given Nova's documented history of controlled substances and alcohol violations, including two instances of drivers operating CMVs under the influence of drugs within the preceding 15 months. Nova's failure to conduct mandatory post-crash testing deprives Plaintiffs and the trier of fact of evidence directly relevant to whether Saldivar was operating the Nova CMV under the influence of alcohol or controlled substances at the time of the crash, and supports an adverse inference that the results of such testing would have been unfavorable to Nova.

***PRIOR CRASH HISTORY***

130. During the 24-month period ending March 15, 2026, Nova was involved in 66 reportable crashes: 2 fatal crashes, 21 injury crashes, and 43 tow-away crashes. For a carrier operating 1,427 power units, this crash volume – particularly the two fatalities and 21 injuries – demonstrates that Nova's operations were generating a significant and ongoing toll of property damage, bodily injury, and death on the public highways.

131. Nova's involvement in 66 crashes in 24 months, combined with the pervasive vehicle maintenance failures, controlled substances violations, and unsafe driving pattern documented herein, establishes that Nova was operating with a known pattern of safety failures that created an unreasonable risk of serious injury or death to others sharing the roadway.

***RELATIONSHIP BETWEEN NOVA LINES, ORIGIN TRANSPORT, AND GLADIUS LEASING***

132. Nova's principal place of business is located at 8535 South 77th Avenue, Bridgeview, Illinois 60455. Gladius Leasing LLC – the entity identified on the crash report as the owner of Trailer 2 on Origin Transport's Kenworth tractor (Vehicle 2)—is also located at 8535 South 77th Avenue, Bridgeview, Illinois 60455. This shared address between Nova Lines and the leasing entity supplying equipment to co-defendant Origin Transport raises a substantial inference of common ownership, management, or control among these entities.

133. Upon information and belief, Nova Lines Inc. and Gladius Leasing LLC share common ownership, officers, managers, or beneficial control. If so, the entities may constitute a single enterprise or joint venture for purposes of liability, and the safety failures of each entity may be attributable to the others under theories of alter ego, agency, joint enterprise, or respondeat

superior. Discovery will establish the precise corporate relationships among Nova Lines Inc., Gladius Leasing LLC, Allectus Leasing Inc. (the owner of the Nova Freightliner tractor), and Origin Transport LLC.

***DATE, TIME, AND LOCATION OF THE CRASH***

134. On February 18, 2026, at approximately 3:00 p.m., a catastrophic multi-vehicle crash occurred on westbound Interstate 80 at or near milepost 18.9 in Uinta County, Wyoming.

135. The crash occurred on the divided interstate highway. The roadway at the location of the crash consisted of two westbound travel lanes with an asphalt surface.

136. At the time of the crash, it was snowing. The road surface was covered with ice and frost. Lighting conditions were daylight. There was no work zone at or near the crash location.

137. The Wyoming Highway Patrol was notified of the crash at approximately 3:07 p.m. and arrived on scene at approximately 3:22 p.m. Emergency medical services were notified at approximately 3:07 p.m. and arrived at approximately 3:35 p.m. The crash was investigated at the scene by Trooper S. Neilson, Wyoming Highway Patrol, Division D, Badge #179.

138. Sharon K. Lengyel, the surviving spouse of Decedent John H. Lengyel and the Plaintiff herein, was a passenger in Vehicle 1 at the time of the crash. She was seated in the front right passenger seat, directly adjacent to her husband, when the events described herein unfolded.

139. She was struck three times – first by the rear-end impact of the Origin CMV, when the Walmart CMV crashed into the Origin CMV, and again when the Nova CMV struck the driver's side of the Silverado with the force sufficient to eject her husband from the vehicle.

140. She sustained serious physical injuries, including soft tissue injuries and head trauma, as a direct result of those impacts. She also witnessed the entirety of the collision sequence,

from the initial rear-end impact through the violent ejection and crushing death of her husband, from within the zone of danger and in immediate proximity to each impact. She survived – he did not.

## ***PARTIES AND VEHICLES INVOLVED***

141. The crash involved five vehicles.

142. Vehicle 1 was a 2023 Chevrolet Silverado, VIN 3GCPDCEK0PG169228, bearing Ohio license plates, color black. Vehicle 1 was a passenger vehicle (not a CMV). Vehicle 1 was owned by its driver, Decedent John H. Lengyel.

143. Vehicle 1 was occupied by two people: the driver, John H. Lengyel, and his wife, Sharon K. Lengyel, who was seated in the front right passenger seat.

144. Vehicle 1 was traveling westbound on Interstate 80 in the right-hand lane. Prior to the crash, Vehicle 1 had slowed to a stop in the right-hand lane due to a prior crash ahead on the interstate. The posted speed at the location was 65 miles per hour. The trooper estimated Vehicle 1's speed at 0–5 miles per hour at the time of the initial impact.

145. Vehicle 2, the Origin CMV, was operated by Defendant Damon Tomlin, an employee of Defendant Origin.

146. Vehicle 2 was traveling westbound on Interstate 80. The posted speed at the location was 65 miles per hour. The investigating officer estimated Vehicle 2's speed at 55 miles per hour at the time of the collision.

147. Vehicle 3, the Nova CMV, was operated by Defendant Luis Saldivar, an employee of Defendant Nova.

148. Vehicle 3 was traveling westbound on Interstate 80. The posted speed was 65 miles

per hour. The trooper estimated Vehicle 3's speed at 45 miles per hour.

149. Vehicle 4, the Walmart CMV, was operated by Defendant Smith, an employee of Defendant Walmart.

150. Vehicle 4 was traveling westbound on Interstate 80. The posted speed was 65 miles per hour. The trooper estimated Vehicle 4's speed at 55 miles per hour.

151. Vehicle 5 was a 2024 Volvo CBE tractor, VIN 4V4NC9EHXRN656355, bearing Indiana license plate 3352541, color white. Vehicle 5 was a commercial motor vehicle operating in a truck tractor/semi-trailer configuration with five axles, gross vehicle weight in excess of 26,000 pounds. The commercial cargo body type was van/enclosed box, carrying general freight. Vehicle 5 was pulling Trailer 4, a 2018 Great Dane trailer (VIN 1GRAP0620JK286291, Indiana plate P678538), registered to Federal Express Corporation, 1515 Gostlin Street, Hammond, Indiana 46327.

152. Vehicle 5 was owned by Federal Express Corporation. Vehicle 5 was operated by James Gregory, male, holding a United Kingdom driver's license of unknown type and class, DL Status unknown. Gregory's USDOT number on the CMV supplement is listed as 868760 (FedEx). Vehicle 5 was traveling westbound on Interstate 80. The posted speed was 65 miles per hour. The officer estimated Vehicle 5's speed at 0 miles per hour – Vehicle 5 was stationary in the traffic queue at the time it was struck.

***<u>PRE-CRASH CONDITIONS</u>***

153. Prior to the crash, westbound Interstate 80 traffic in the area of milepost 18.9 was slowing and stopping due to a crash ahead. Variable speed limit signs in the area had been lowered to 65 miles per hour due to weather and road conditions, including snow and ice on the roadway.

154. Vehicle 1, the Chevrolet Silverado operated by Decedent John H. Lengyel, had slowed to a stop in the left westbound travel lane. Sharon K. Lengyel was seated beside her husband as they waited in stopped traffic, unaware that the commercial vehicles approaching from behind were traveling at speeds wholly incompatible with the icy conditions ahead of them.

155. Moments later, Vehicle 2, the Origin CMV operated by Defendant Damon Tomlin, approached Vehicle 1 from behind. Defendant Tomlin was traveling at approximately 55 miles per hour – a speed that was grossly excessive for the icy and snow-covered road conditions and the slowed traffic ahead.

156. As Tomlin approached the stationary Silverado, he attempted to swerve left to avoid a collision. However, Tomlin lost control of the Origin CMV on the icy roadway. The front right of the Origin CMV struck the rear left of the Silverado with significant force.

157. Sharon K. Lengyel felt and experienced the initial rear-end impact from within Vehicle 1. The violent collision subjected her body to sudden and severe forces, causing injuries. The impact spun the Silverado out of the travel lane and into the emergency lane, placing Sharon and her husband in immediate peril from the surrounding commercial traffic.

158. The impact caused the Origin CMV to jackknife. The jackknifed tractor-trailer veered into the median guardrail, struck the guardrail, and rebounded back into the center of the interstate, where it came to rest blocking both westbound travel lanes.

159. Next, in the left-hand lane, the Walmart CMV, which was traveling too fast for the winter weather conditions, a direct violation of 49 CFR 392.14 (commercial motor vehicle drivers must use extreme caution in hazardous weather conditions), violently crashed into the cab of the Origin CMV, dislodging the jackknifed Origin CMV and causing the Lengyel's Silverado to spin

directly into further danger.

160. The force of the Walmart CMV's collision with the Origin CMV sent the Silverado into a clockwise spin, subjecting its occupants to further sudden, severe injury-causing forces, while throwing the truck from the right travel lane into the emergency lane.

161. At that moment, Vehicle 3, the Nova CMV operated by Luis A. Saldivar, was approaching westbound in the same area at approximately 45 miles per hour – also an unsafe speed for the conditions. The Nova CMV's found the now-stationary Silverado directly in its path.

162. Vehicle 3 struck the driver's side of Vehicle 1 with devastating force. The impact was of sufficient violence to eject John H. Lengyel from the Silverado. Sharon K. Lengyel, still inside the vehicle, was subjected to a second severe impact – compounding the physical trauma she had already sustained – as the Nova CMV drove into the side of the Silverado at the seat occupied by her husband. John Lengyel was subsequently crushed between the side of his own vehicle and the front left wheel of the Nova CMV.

163. The images below show the aftermath of the crash sequence:




164. Sharon K. Lengyel witnessed her husband's ejection and crushing from within the immediate scene, herself injured and unable to render aid. Despite having sustained serious physical injuries from three successive impacts – including soft tissue injuries and head trauma – Sharon remained conscious and present at the scene. She saw John Lengyel thrown from the vehicle they shared and saw him crushed to death before her eyes. She could not reach him. She could not save him. She was powerless to do anything but witness the violent death of her husband

of 55 years at the hands of Defendants whose negligence and recklessness made that death inevitable.

165. John H. Lengyel succumbed to his injuries on scene.

166. In the immediate aftermath of the collision, none of the commercial vehicle operators whose negligence caused the crash, including Defendants Smith, Tomlin and Saldivar, rendered aid to John Lengyel or to Sharon K. Lengyel. Sharon remained at the scene, physically injured, in shock, and surrounded by the carnage created by Defendants' conduct, without assistance from those responsible for it. Emergency medical services did not arrive until approximately 3:35 p.m. – nearly thirty minutes after the crash – leaving Sharon to endure the scene of her husband's death without medical attention or comfort from anyone.

167. After plowing through the jackknifed Origin CMV, the Walmart CMV came to a rest by crashing into the rear of Vehicle 5, the FedEx tractor-trailer.

168. The acts and omissions of Defendants Walmart, Smith, Nova, Allectus, Gladius, Saldivar, Origin, Penske, and Tomlin were a substantial contributing cause of the fatal incident, either alone or in combination with the acts or omissions of others.

169. The acts, errors and omissions of Defendants Walmart, Smith, Nova, Allectus, Gladius, Saldivar, Origin, Penske, and Tomlin caused the fatal incident, and Defendants Nova, Allectus, Gladius, Saldivar, Origin, Penske, and Tomlin are liable, individually and jointly and severally, for their negligence regardless of the fault of others.

## ***NOVA'S DESTRUCTION OF EVIDENCE***

170. The Nova CMV, Vehicle 3, operated by Defendant Saldivar and owned and/or operated under the authority of Defendant Nova, was directly involved in the fatal striking of John

H. Lengyel and the physical injuries of Sharon K. Lengyel. The Nova CMV's engine control module ("ECM") and event data recorder ("EDR") contained critical data bearing on the speed, braking, throttle application, and operational history of the Nova CMV in the moments before, during, and after the collision.

171. ECM and EDR data stored on commercial motor vehicles is finite and subject to overwrite. In heavy commercial trucks, ECM data – including hard braking events, vehicle speed, engine RPM, throttle position, and cruise control status – is routinely overwritten as new operational data is generated during subsequent vehicle operation. Once overwritten, that data cannot be recovered.

172. Following the crash on February 18, 2026, Defendants Nova and Saldivar knew, or reasonably should have known, that the Nova CMV was directly involved in a fatal collision and that litigation was reasonably foreseeable. The duty to preserve all evidence related to the crash, including ECM and EDR data stored on the Nova CMV, arose immediately upon the occurrence of the fatal collision.

173. Notwithstanding that duty, Defendants Nova and/or its agents, employees, or representatives caused or permitted the Nova CMV to be driven from the crash scene in Uinta County, Wyoming, back to Illinois – a distance of approximately 1,250 miles – before any ECM or EDR download was performed.

174. Upon information and belief, the operation of the Nova CMV over that distance caused the ECM and EDR data recording of the Nova CMV's pre-crash speed, braking inputs, and other operational parameters to be partially or wholly overwritten and permanently destroyed.

175. At no point prior to the relocation of the Nova CMV did Defendants Nova or

Saldivar arrange for, or provide Plaintiff with notice of, any opportunity to inspect or download the ECM or EDR data stored on the vehicle.

176. The identity of the person or persons who authorized or directed the Nova CMV to be driven to Illinois before ECM data was preserved is not presently known the Plaintiff and is within the exclusive knowledge and control of Defendants Nova and Saldivar. That information is subject to discovery.

177. The destruction of ECM and EDR data from the Nova CMV was not the result of routine data retention practices or unavoidable data loss. It was the direct and foreseeable consequence of Defendants Nova's and Saldivar's decision to place the vehicle back into operation – or to permit its operation – before preserving the electronically stored evidence it contained, at a time when their duty to preserve that evidence had already arisen.

As a result of Defendants Nova's and Saldivar's failure to preserve the ECM and EDR data, Plaintiff has been permanently deprived of evidence that was material to establishing the speed, braking behavior, and operational conduct of the Nova CMV in the moments leading up to the fatal crash.

***<u>WALMART'S UNAUTHORIZED INSPECTION OF THE NOVA CMV</u>***

178. Upon information and belief, following the crash forming the basis of this action, Defendant Walmart caused or arranged for an expert, agent, or representative to conduct a physical inspection of the Nova CMV (Vehicle 3), the tractor operated by Defendant Saldivar that contributed to the death of John H. Lengyel, without providing notice of that inspection to Plaintiff, to co-defendants, or to their respective counsel and experts.

179. The inspection of the Nova CMV conducted by or on behalf of Walmart was

performed at a time, place, and under circumstances not presently known to Plaintiff, as this information is within the exclusive knowledge and control of Defendants Walmart, Nova, Allectus, and Gladius, and has not been disclosed in any formal discovery response, expert disclosure, or court filing. The full circumstances of the inspection - including when it occurred, where it occurred, who conducted it, what methodology was employed, what components or systems of the Nova CMV were examined or tested, and what, if any physical changes to the vehicle resulted – are subject to discovery and unknown to Plaintiff at this stage.

180. The Nova CMV constituted material physical evidence in this litigation. Every party to this action, including Defendant Walmart, was on notice of the vehicle's evidentiary significance from the moment the fatal crash occurred. The duty to preserve physical evidence, and to refrain from conducting ex parte inspections that alter, disturb, or consume that evidence without notice to adverse parties, attached immediately and applied with equal force to all defendants.

181. An inspection of a crash-involved CMV by a retained expert is not a neutral or passive act. Depending on the methodology employed, such an inspection may involve the removal, testing, or displacement of physical components; the documentation of conditions that are thereafter altered by continued vehicle operation, repair, or deterioration; the collection of samples or specimens that are consumed in testing; or the creation of a privileged record of the vehicle's condition at a point in time that is thereafter unavailable to other parties who did not receive notice of the inspection and an opportunity to attend.

182. To the extent that Walmart's expert inspection of the Nova CMV involved any physical interaction with, testing of, removal of, or disturbance to any component of the vehicle,

including but not limited to the braking system, tires, suspension, cargo securement systems, ECM or EDR connections, or any other system relevant to the cause and severity of the crash, and to the extent that such interaction altered, consumed, or degraded evidence that was material to Plaintiff's claims, Defendant Walmart bears responsibility for the resulting spoliation of that evidence.

183. Upon information and belief, the inspection was conducted without notice to Plaintiff or to co-defendants Nova, Allectus, Gladius, Origin, or Penske, and without affording any party an opportunity to have their own counsel or experts present during the inspection. The failure to provide notice of the inspection deprived Plaintiff and other parties of the opportunity to observe the condition of the Nova CMV at the time of inspection, to document findings independently, to object to any testing or component removal, and to preserve a contemporaneous record of the vehicle's post-crash condition – rights and opportunities that cannot be retroactively restored.

184. The identity of the expert, agent, or representative who conducted the inspection on Walmart's behalf; the date, time, and location of the inspection; the scope and methodology of the inspection; any reports, photographs, measurements, or other documentation generated during the inspection; and any physical changes to the Nova CMV resulting from the inspection are all within the exclusive knowledge and control of Defendant Walmart and are subject to immediate and complete disclosure in discovery.

185. Plaintiff reserves all rights to seek sanctions, adverse inference instructions, and other appropriate relief upon a full development of the facts surrounding Walmart's unauthorized inspection of the Nova CMV, including but not limited to relief under Federal Rule of Civil Procedure 37(e) to the extent electronically stored information was affected, and under the Court's inherent authority to remedy prejudice resulting from the spoliation of material evidence.

## **CAUSES OF ACTION**

### **COUNT I – Wrongful Death**

### **(Against All Defendants)**

186. Plaintiff realleges and incorporates by reference all other paragraphs as if restated verbatim.

187. Plaintiff brings this action pursuant to Wyo. Stat. § 1-38-101 *et seq*. for wrongful death for all recoverable damages of all statutory beneficiaries.

188. Defendants' negligent acts proximately caused and were substantial factors in causing the death of John Lengyel and for which Plaintiff Sharon Lengyel brings this action.

The Defendants' negligent acts and omissions, individually and/or combined, caused the death of John Lengyel and caused the statutory beneficiaries' injuries and damages including, without limitation, loss of love, affection, companionship, care, protection, guidance in the past and future, and expense associated with funeral, burial, lost wages, and other recoverable damages in an amount to be determined at trial.

### **COUNT II – NEGLIGENCE**

### **(Against Smith, Tomlin &Saldivar)**

189. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

190. Smith, Tomlin and Saldivar owed a duty to the motoring public (including Plaintiff) to use reasonable care in the operation of their respective tractor-trailers.

191. Tomlin breached this duty by failing to control the tractor trailer.

192. Saldivar breached this duty by failing to control the tractor trailer.

193. Smith breached this duty by failing to control the tractor trailer.

194. Smith, Tomlin and Saldivar further breached their duty of reasonable care by violating Wyoming State Statute § 31-5-301(a), requiring no person to drive a vehicle on a highway at a speed greater than is reasonable and prudent under existing conditions, hazards or traffic. This statute requires adjusting speed for snow and ice, regardless of speed limit, which Tomlin, Saldivar and Smith did not do in this case.

195. Smith, Tomlin and Saldivar further breached their duty of reasonable care by violating Wyoming State Statute § 31-5-229, Reckless Driving, by operating their respective CMVs with willful or wanton disregard for the safety of the motoring public, including John Lengyel, by driving too fast for conditions.

196. Smith, Tomlin and Saldivar further breached their duty of reasonable care by violating Wyoming State Statute § 31-5-236, Careless Driving, by operating the Defendant CMV in a manner inconsistent with the exercise of due and diligent care normally exercised by a reasonable person under similar circumstances, creating an unreasonable risk of harm to other motorists by driving too fast for conditions.

197. Finally, 49 C.F.R. § 392.14 requires drivers to exercise "extreme caution" when hazardous weather conditions adversely affect visibility or traction as it relates to a motor vehicle. As described herein, Smith, Tomlin and Saldivar breached this duty by driving too fast for conditions.[1]

---

[1] **§ 392.14 Hazardous conditions; extreme caution.**

Extreme caution in the operation of a commercial motor vehicle shall be exercised when hazardous conditions, such as those caused by snow, ice, sleet, fog, mist, rain, dust, or smoke, adversely affect visibility or traction. Speed shall be reduced when such conditions exist. If conditions become sufficiently dangerous, the operation of the commercial motor vehicle shall be discontinued and shall not be resumed until the commercial motor vehicle can be safely operated. Whenever compliance with the foregoing provisions of this rule increases hazard to passengers, the

198. Defendants' negligent acts or omissions, individually or combined, were direct and proximate causes of the crash and Plaintiff's resulting injuries and harms, as set forth more fully below.

199. Plaintiff is entitled to recover all legally available damages, including compensatory damages, general damages, costs, and all relief the Court deems just, as set forth more fully below.

**COUNT III – VICARIOUS LIABILITY**

**(Against Walmart)**

200. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

201. Defendant Walmart is vicariously liable for the negligence, acts and/or omissions by those acting with or on behalf of Defendant Walmart.

202. As a result of the negligence, acts, and/or omissions of Smith (for which Walmart is vicariously liable) Plaintiff has suffered injuries and damages as set forth more fully herein.

203. Plaintiff is entitled to recover all legally available damages, including compensatory damages, general damages, punitive damages, costs and all relief the Court deems just, as set forth more fully below.

**COUNT IV – VICARIOUS LIABILITY AS STATUTORY EMPLOYER**

**(Against Walmart)**

204. Plaintiff incorporates by reference and re-alleges every other paragraph as if

commercial motor vehicle may be operated to the nearest point at which the safety of passengers is assured.

49 CFR 392.14.

restated verbatim.

205. Walmart is an authorized interstate motor carrier.

206. Walmart was hauling cargo in interstate commerce.

207. Smith, who was operating the commercial motor vehicle at the time of this incident, was a statutory employee of Walmart in accordance with the provisions of 49 C.F.R. § 390.5.

208. Walmart is vicariously liable for the negligent acts and/or omissions of Smith.

**COUNT V – VICARIOUS LIABILITY**

**(Against Origin & Penske)**

209. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

210. Defendants are vicariously liable for the negligence, acts and/or omissions by those acting with or on behalf of Defendants Origin and Penske.

211. As a result of the negligence, acts, and/or omissions of Tomlin (for which Defendants Origin and Penske are vicariously liable) Plaintiff has suffered injuries and damages as set forth more fully herein.

212. Plaintiff is entitled to recover all legally available damages, including compensatory damages, general damages, punitive damages, costs and all relief the Court deems just, as set forth more fully below.

**COUNT VI – VICARIOUS LIABILITY AS STATUTORY EMPLOYER**

**(Against Origin and Penske)**

213. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

214. Origin is an authorized interstate motor carrier.

215. Origin entered an agreement with a customer to haul cargo in interstate commerce.

216. Pursuant to this agreement, Origin entered an arrangement with another party to use equipment that Origin did not own to transport property, as set forth by 49 U.S.C. § 14012(a). Namely, the equipment was the trailer owned by Penske.

217. Tomlin, who was operating the commercial motor vehicle at the time of this incident, was a statutory employee of Origin and Penske in accordance with the provisions of 49 C.F.R. § 390.5.

218. Origin and Penske are jointly vicariously liable for the negligent acts and/or omissions of Tomlin.

**<u>COUNT VII – VICARIOUS LIABILITY</u>**

**(Against Nova, Gladius and Allectus)**

219. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

220. Defendants are vicariously liable for the negligence, acts and/or omissions by those acting with or on behalf of Defendants Nova, Gladius and Allectus.

221. As a result of the negligence, acts, and/or omissions of Saldivar (for which Defendants Nova, Gladius and Allectus are vicariously liable) Plaintiff has suffered injuries and damages as set forth more fully herein.

222. Plaintiff is entitled to recover all legally available damages, including compensatory damages, general damages, punitive damages, costs and all relief the Court deems just, as set forth more fully below.

## COUNT VIII – VICARIOUS LIABILITY AS STATUTORY EMPLOYER

**(Against Nova, Allectus and Gladius)**

223. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

224. Origin is an authorized interstate motor carrier.

225. Origin entered an agreement with a customer to haul cargo in interstate commerce.

226. Pursuant to this agreement, Nova entered an arrangement with another party to use equipment that Nova did not own to transport property, as set forth by 49 U.S.C. § 14012(a). Namely, the equipment was the trailer owned by Gladius and the tractor owned by Allectus.

227. Saldivar, who was operating the commercial motor vehicle at the time of this incident, was a statutory employee of Nova, Gladius and Allectus in accordance with the provisions of 49 C.F.R. § 390.5.

228. Nova, Gladius and Allectus are jointly vicariously liable for the negligent acts and/or omissions of Saldivar.

## COUNT IX – JOINT VENTURE

**(Against Origin and Penske)**

229. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

230. At all relevant times Origin and Penske were engaged in a joint venture and/or joint enterprise for the commercial transport of goods for profit.

231. The purpose of the joint venture was to combine capital, equipment, operating authority, and labor to transport freight on public highways in exchange for compensation.

232. Origin and Penske had (1) an agreement, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation in profits and losses.

233. Defendants shared a community of pecuniary interest in the transportation activity giving rise to the incident, including but not limited to (1) revenue generated from the haul, (2) reduced operating costs through equipment leasing and subcontracting, and (3) mutual economic benefit derived from the movement of freight.

234. Each Defendant stood to profit financially from the successful completion of the haul and bore the risk of loss arising from delays, accidents, or regulatory violations.

235. Defendants each retained and exercised an equal right of control over the transportation operation, including but not limited to (1) authorization of the use of the tractor and trailer, (2) control over which drivers were permitted to operate the equipment, (3) requirements related to maintenance, (4) inspection, and condition of the equipment, (5) compliance with safety regulations, and (6) the terms under which the haul was conducted.

236. Origin exercised operational control through use of its tractor, operating authority, placard, dispatch, and safety management responsibilities.

237. Penske exercised control by supplying the trailer, retaining authority over its use, maintenance, and condition, and permitting it to be used in interstate commerce for profit.

238. Each Defendant possessed the right to prevent the negligent conduct that caused the collision by refusing to authorize the haul, withdrawing equipment, enforcing safety requirements, or disqualifying unsafe drivers.

239. Defendants entered into express and/or implied agreements to carry out the haul together, as evidenced by: (1) the coordinated use of Origin’s authority, (2) Origin’s provision of

the power unit, (3) Penske's provision of the trailer, and (4) the shared objective of completing the haul for mutual financial benefit.

240. The joint venture agreement need not have been formal or written and may be inferred from the conduct of the parties, their course of dealing, and their coordinated commercial activity.

241. At the time of the incident, Tomlin was acting within the course and scope of the joint venture, furthering its business purpose.

242. The negligent maintenance of the Defendant CMV occurred during the performance of the joint venture's transportation activities and in direct furtherance of Defendants' shared commercial objectives.

243. Under principles of joint venture and joint enterprise liability, each Defendant is vicariously liable for the negligent acts and omissions of the driver committed within the scope of the joint venture.

244. The negligence of Tomlin is imputed to each Defendant, rendering them jointly and severally liable for Plaintiff's injuries and damages.

245. Defendants' joint venture created the conditions and circumstances that allowed an unsafe tractor-trailer to operate on public highways.

246. Origin and Penske are jointly and severally liable for their own acts and for the negligent acts and omissions as joint-venturers.

247. The acts of each are therefore attributable to the rest.

248. As a direct and proximate result of the Defendants' joint venture and the negligent acts committed in furtherance thereof, Plaintiff suffered severe damages as set forth herein.

**COUNT X – JOINT VENTURE**

**(Against Nova, Allectus & Gladius)**

249. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

250. At all relevant times Nova, Allectus and Gladius were engaged in a joint venture and/or joint enterprise for the commercial transport of goods for profit.

251. The purpose of the joint venture was to combine capital, equipment, operating authority, and labor to transport freight on public highways in exchange for compensation.

252. Origin, Allectus and Gladius had (1) an agreement, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation in profits and losses.

253. Defendants shared a community of pecuniary interest in the transportation activity giving rise to the incident, including but not limited to (1) revenue generated from the haul, (2) reduced operating costs through equipment leasing and subcontracting, and (3) mutual economic benefit derived from the movement of freight.

254. Each Defendant stood to profit financially from the successful completion of the haul and bore the risk of loss arising from delays, accidents, or regulatory violations.

255. Defendants each retained and exercised an equal right of control over the transportation operation, including but not limited to (1) authorization of the use of the tractor and trailer, (2) control over which drivers were permitted to operate the equipment, (3) requirements related to maintenance, (4) inspection, and condition of the equipment, (5) compliance with safety regulations, and (6) the terms under which the haul was conducted.

256. Nova exercised operational control through use of its operating authority, placard,

dispatch, and safety management responsibilities.

257. Allectus exercised control by supplying the power unit, authorizing its use for commercial hauling, and entrusting the tractor to the driver and Nova.

258. Gladius exercised control by supplying the trailer, retaining authority over its use, maintenance, and condition, and permitting it to be used in interstate commerce for profit.

259. Each Defendant possessed the right to prevent the negligent conduct that caused the collision by refusing to authorize the haul, withdrawing equipment, enforcing safety requirements, or disqualifying unsafe drivers.

260. Defendants entered into express and/or implied agreements to carry out the haul together, as evidenced by: (1) the coordinated use of Nova's authority, (2) Allectus' provision of the power unit, (3) Gladius' provision of the trailer, and (4) the shared objective of completing the haul for mutual financial benefit.

261. The joint venture agreement need not have been formal or written and may be inferred from the conduct of the parties, their course of dealing, and their coordinated commercial activity.

262. At the time of the incident, Saldivar was acting within the course and scope of the joint venture, furthering its business purpose.

263. The negligent maintenance of the Defendant CMV occurred during the performance of the joint venture's transportation activities and in direct furtherance of Defendants' shared commercial objectives.

264. Under principles of joint venture and joint enterprise liability, each Defendant is vicariously liable for the negligent acts and omissions of the driver committed within the scope of

the joint venture.

265. The negligence of Saldivar is imputed to each Defendant, rendering them jointly and severally liable for Plaintiff's injuries and damages.

266. Defendants' joint venture created the conditions and circumstances that allowed an unsafe tractor-trailer to operate on public highways.

267. Nova, Allectus, and Gladius are jointly and severally liable for their own acts and for the negligent acts and omissions as joint-venturers.

268. The acts of each are therefore attributable to the rest.

269. As a direct and proximate result of the Defendants' joint venture and the negligent acts committed in furtherance thereof, Plaintiff suffered severe damages as set forth herein.

**COUNT XI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(Against All Defendants)**

270. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

271. At all times relevant to this action, Defendants owed a duty of reasonable care to Plaintiff Sharon K. Lengyel and to all persons foreseeably in the zone of danger created by the operation of commercial motor vehicles on public roadways, including occupants of other vehicles in the path of that vehicle and family members foreseeably present at the scene of a collision caused by such negligence.

272. Plaintiff Sharon Lengyel was a passenger in the vehicle driven by her husband, John Lengyel, at the time of the collision described herein. She was present at the scene, within the zone of danger created by Defendants' negligent operation of the subject commercial motor

vehicle and was herself at immediate risk of death or serious physical injury as a result of that negligence.

273. As a direct and proximate result of Defendants' negligence, Plaintiff Sharon Lengyel was placed in reasonable and immediate fear for her own physical safety and was exposed to a catastrophic collision of such violence that it caused the death of her husband in her presence.

274. Plaintiff Sharon Lengyel witnessed, through direct and contemporaneous sensory perception, the entirety of the traumatic events giving rise to this action, including the violent impact of the collision, the ejection of her husband, John Lengyel, from their vehicle, and the fatal crushing injuries he sustained before her eyes. Plaintiff Sharon Lengyel had no ability to intervene, render meaningful aid, or prevent her husband's death.

275. In the immediate aftermath of the collision, the Defendants whose negligence caused the crash failed to render any assistance to John Lengyel or to Plaintiff Sharon Lengyel, leaving Plaintiff Sharon Lengyel to witness her husband's death without aid, comfort, or intervention from those responsible for the catastrophe they had caused. This abandonment compounded the traumatic impact of the event on Plaintiff Sharon Lengyel and prolonged her exposure to the scene of her husband's death.

276. Plaintiff Sharon Lengyel is the surviving spouse of John Lengyel. The close familial relationship between Sharon Lengyel and John Lengyel is of the most intimate kind recognized by law and by human experience and is precisely the class of relationship Wyoming law contemplates in recognizing bystander claims for negligent infliction of emotional distress.

277. As a direct and proximate result of witnessing her husband's ejection, crushing, and death – and of being abandoned at the scene by those responsible – Plaintiff Sharon Lengyel has

suffered severe emotional distress with attendant physical manifestations, including but not limited to post-traumatic stress disorder, debilitating depression, sleep disturbance, and chronic physical symptoms causally attributable to the emotional trauma she endured.

278. The emotional distress suffered by Plaintiff Sharon Lengyel was a reasonably foreseeable consequence of Defendants' negligence. A reasonable person in Sharon Lengyel's position – present at the scene, in the zone of danger, and in the closest possible familial relationship to the primary victim – would foreseeably suffer severe emotional distress upon witnessing the events described herein.

279. As a direct and proximate result of Defendants' negligence, Plaintiff Sharon Lengyel has suffered damages including severe and ongoing emotional distress, physical manifestations of that distress, loss of enjoyment of life, and such other damages as will be proven at trial, separate and apart from the wrongful death damages she seeks in her representative capacity.

## COUNT XII – DIRECT NEGLIGENCE OF DEFENDANT ORIGIN

**(against Defendant Origin & Penske)**

280. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

281. At all times relevant to this action, Defendant Tomlin was an employee and/or agent and/or statutory employee of Defendant Origin and/or its affiliated entity Penske and was operating the Origin CMV within the course and scope of that employment and agency. Defendants Origin and Penske are vicariously liable for the negligent acts and omissions of Defendant Tomlin. Plaintiff pleads this count of direct negligence against Origin and Penske separately and in addition to, not in lieu of,

vicarious liability.

**Tomlin's Negligent Operation Revisited**

282. Defendant Tomlin was negligent in the operation of the Origin CMV as stated above and in the following respects, among others:

a. Operating the Origin CMV at approximately 55 miles per hour on an icy, snow-covered interstate highway where traffic ahead had slowed to a stop – conduct that the investigating Wyoming Highway Patrol trooper characterized as "driving too fast for conditions";

b. Failing to perceive, or failing to respond to, the plainly visible hazard of slowed and stopped traffic ahead on westbound Interstate 80 in active winter conditions;

c. Failing to reduce speed sufficiently to maintain control of the Origin CMV on an icy roadway under conditions that demanded a material reduction in speed well below the posted 65 mile-per-hour limit;

d. Failing to brake in time to avoid striking Vehicle 1, a stationary passenger vehicle occupied by John H. Lengyel and Sharon K. Lengyel;

e. Losing control of the Origin CMV on the icy roadway, causing it to jackknife and rebound into both westbound travel lanes; and

f. Failing to render aid to John H. Lengyel or Sharon K. Lengyel following the crash, in violation of the general duty of care owed to crash victims, leaving Sharon K. Lengyel – herself physically injured – without assistance at the scene of her husband's death.

**Origin's Direct Negligence**

283. Defendant Origin was independently and directly negligent in the following respects, among others:

284. *Negligent Entrustment:* Entrusting the operation of a loaded commercial motor vehicle to Defendant Tomlin and dispatching that vehicle onto Interstate 80 in documented winter conditions, despite the fact that Origin's own fleet-wide Driver Out-of-Service rate of 9.5%, approximately 48% above the national average, reflected systemic and carrier-wide failures to ensure its drivers were qualified, credentialed, and fit for duty before being placed behind the wheel of a CMV. Origin entrusted Tomlin with the specific tractor bearing Idaho plate BH8171, a vehicle whose own inspection history included windshield damage and an ABS defect identified just fourteen days before the crash, tire tread deficiencies, and an audible brake air leak – deficiencies that Origin knew about and failed to remediate before dispatching Tomlin onto an icy Wyoming interstate;

285. *Negligent Hiring:* Hiring Defendant Tomlin without conducting the driver qualification inquiries required by 49 C.F.R. Part 391, against the backdrop of an established carrier pattern of employing drivers without valid commercial driver's licenses and drivers whose licenses had been suspended or revoked – including an instance in May 2025 in which an Origin driver was placed out of service for operating without a valid CDL and without a valid medical examiner's certificate, violations that a required pre-employment motor vehicle record check would have revealed;

286. *Negligent Retention:* Retaining Defendant Tomlin and other drivers in commercial driving capacities notwithstanding Origin's documented awareness – through inspection reports

and SMS data transmitted directly to Origin – of systematic hours-of-service violations, falsified records of duty status, and unsafe driving violations across its fleet. Between August 19, 2024 and February 24, 2026, Origin drivers were cited on at least seven separate occasions for making false reports in records of duty status under 49 C.F.R. § 395.8(e) – affirmative misrepresentations designed to conceal true hours of service – with the most recent such violation occurring just six days after the crash made the basis of this action, demonstrating that the carrier's culture of log falsification was active and ongoing at the time of the collision;

287. *Negligent Supervision:* Failing to adequately monitor, supervise, and correct the driving conduct of its fleet, despite receiving direct notice of each roadside inspection violation through enforcement-generated reports and continuous access to its FMCSA Safety Measurement System data. During the 24-month period ending February 27, 2026, 58.8% of all Origin roadside inspections resulted in documented violations, yielding an Unsafe Driving BASIC measure that reflected four citations for speeding 15 or more miles per hour over the posted limit – the maximum severity weight of 10 – and numerous additional speeding and traffic violations. Despite this cumulative and unambiguous record of fleet-wide noncompliance, Origin failed to implement any demonstrable corrective action. The investigating trooper's finding that Tomlin was "driving too fast for conditions" at the time of the fatal crash is the predictable consequence of a carrier that tolerated chronic and extreme speeding violations across its fleet without correction;

288. *Negligent Training:* Failing to adequately train Defendant Tomlin in the safe operation of a commercial motor vehicle in adverse winter weather conditions, including speed management on icy roadways, recognition of and response to slowed or stopped traffic in reduced-traction environments, and proper braking techniques for loaded tractor-trailers on ice and snow –

deficiencies made foreseeable by Origin's documented fleet-wide pattern of unsafe driving violations and loss-of-control incidents on the public highways;

289. *Negligent Policies and Safety Management:* Failing to establish, implement, enforce, or maintain adequate safety policies, practices, and programs governing speed management and adverse weather operations of its drivers in a manner consistent with the FMCSRs and the standard of care applicable to commercial motor carriers – a failure confirmed by the breadth and persistence of Origin's ELD noncompliance, including failures to mount ELDs in fixed positions, failures to maintain required ELD documentation, and failures to ensure drivers reviewed and certified the accuracy of ELD-recorded data, all of which facilitated the very hours-of-service concealment and unsafe driving conduct documented across Origin's fleet; and

290. *Failure to Conduct Mandatory Post-Crash Drug and Alcohol Testing:* Failing to ensure that Defendant Tomlin was tested for alcohol within eight hours and for controlled substances within thirty-two hours of the fatal crash, as required by 49 C.F.R. § 382.303(a). The investigating officer's crash report reflects that no alcohol test and no drug test was performed on Tomlin. Origin's failure to conduct mandatory post-crash testing constitutes an independent violation of the FMCSRs and deprives Plaintiff and the trier of fact of evidence directly relevant to whether Tomlin was impaired at the time of the crash, and supports an adverse inference that the results of such testing would have been unfavorable to Origin.

**Causation and Damages**

291. The negligence of Defendants Origin and Tomlin was a direct and proximate cause of the crash described herein. The Origin CMV's rear-end strike of Vehicle 1 initiated the collision sequence that spun the Silverado into the path of the Nova CMV, resulting in the ejection and

crushing death of John H. Lengyel and the serious physical and emotional injuries sustained by Sharon K. Lengyel. But for the negligence of Defendants Origin and Tomlin, the collision sequence would not have occurred and John H. Lengyel would not have died.

292. As a direct and proximate result of the negligence of Defendants Origin and Tomlin, Plaintiff Sharon K. Lengyel, individually and as wrongful death representative of John H. Lengyel, has suffered damages including wrongful death, loss of consortium, serious personal physical injuries, severe emotional distress, and all other damages recoverable under Wyoming law, in amounts to be proven at trial.

**COUNT XIII – PUNITIVE DAMAGES – DEFENDANTS ORIGIN & TOMLIN**

293. The conduct of Defendant Origin described herein warrants the imposition of punitive damages. Origin dispatched Defendant Tomlin onto Interstate 80 through Wyoming – one of the most notoriously dangerous winter driving corridors in the United States – in documented snow and ice conditions, in a tractor with an ABS defect and tire deficiencies identified just fourteen days earlier, without ensuring Tomlin had the training or competency to safely manage a loaded CMV in those conditions. It did so against the backdrop of a carrier-wide safety record demonstrating that nearly one in every ten Origin drivers was so unfit or out of compliance that enforcement officers ordered them out of service on the spot; that Origin drivers had falsified their records of duty status on at least seven documented occasions in the preceding eighteen months; that Origin had previously placed at least one driver on the road without a valid CDL and at least one driver on the road while disqualified; and that Origin had accumulated four citations for the most extreme speeding category – 15 or more miles per hour over the limit – during the same period, without demonstrable corrective action. Origin further failed to conduct mandatory post-

crash drug and alcohol testing of Tomlin following a crash that killed a man in front of his wife, depriving Plaintiff of evidence of whether its driver was impaired. Origin's conduct, viewed in its totality, reflects not inadvertence but a systemic, carrier-level indifference to the safety of the motoring public that rises to the level of willful and wanton misconduct for which punitive damages are warranted and appropriate under Wyoming law.

**COUNT XIV – DIRECT NEGLIGENCE OF DEFENDANT NOVA**

**(against Defendants Nova, Allectus and Gladius)**

294. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

295. At all times relevant to this action, Defendant Saldivar was an employee and/or agent and/or statutory employee of Defendant Nova and/or its affiliated entities Allectus and Gladius, and was operating the Nova CMV within the course and scope of that employment and agency. Defendants Nova, Allectus, and Gladius are vicariously liable for the negligent acts and omissions of Defendant Saldivar. Plaintiff pleads this count of direct negligence against Nova, Allectus, and Gladius separately and in addition to, not in lieu of, vicarious liability.

**Saldivar's Negligent Operation Revisited**

296. As described above, Defendant Saldivar was negligent in the operation of the Nova CMV in the following respects, among others:

1. Operating the Nova CMV at approximately 45 miles per hour on an icy, snow-covered interstate in an area where a multi-vehicle collision sequence was actively unfolding ahead – a speed that was unsafe and excessive for the conditions present and the hazards visible;

2. Failing to perceive, or failing to respond to, the Silverado in his lane of travel at a time when adequate perception and response would have permitted evasive action or a reduction in speed sufficient to avoid or materially mitigate the impact;

3. Failing to reduce speed and maintain control of the Nova CMV in conditions – active snowfall, ice-covered roadway, obstructed lanes – that plainly demanded a material reduction in speed;

4. Striking the driver's side of Vehicle 1 with sufficient force to eject John H. Lengyel from the vehicle and crush him to death beneath the Nova CMV's front left wheel, in the immediate presence of his wife; and

5. Failing to render any aid to John H. Lengyel or to Sharon K. Lengyel following the crash, leaving Sharon K. Lengyel physically injured, in shock, and without assistance for the nearly thirty minutes that elapsed before emergency medical services arrived.

**Nova's Direct Negligence**

297. Defendants Nova, Allectus, and Gladius were independently and directly negligent in the following respects, among others:

298. *Negligent Entrustment:* Entrusting the Nova CMV to Defendant Saldivar and dispatching that vehicle onto Interstate 80 in winter conditions, despite operating a fleet in which nearly one in every three vehicle inspections (a Vehicle Out-of-Service rate of 30.4%, approximately 31% above the national average) resulted in enforcement officers finding Nova vehicles so mechanically deficient that they were ordered off the road immediately. Nova entrusted

Saldivar with a vehicle drawn from a fleet that had generated 82 or more tire-related out-of-service orders and 13 out-of-service orders for brakes so deficient that 20% or more of the vehicle's service brakes were inoperative – the threshold at which federal regulations deem a CMV too dangerous to operate – during the preceding 24 months alone. On an icy interstate in winter conditions, where tire integrity and braking capacity are the difference between a controlled stop and a fatal collision, Nova's entrustment of this vehicle to this driver under these conditions was negligent;

299. *Negligent Hiring:* Hiring Defendant Saldivar without conducting the driver qualification inquiries required by 49 C.F.R. Part 391, against the backdrop of a documented carrier pattern of employing unqualified and disqualified drivers – including a driver placed out of service in December 2025, approximately two months before the crash, for operating a Nova CMV without a valid CDL; a driver cited in August 2025 for operating while their CDL was disqualified; and at least three additional instances between March 2025 and January 2026 in which Nova drivers were cited for operating CMVs while their licenses were suspended – all of which demonstrate that Nova's pre-employment and annual driver qualification screening program was ineffective or unenforced;

300. *Negligent Retention:* Retaining Defendant Saldivar and other drivers in commercial driving capacities despite Nova's documented awareness, through enforcement-generated inspection reports and FMCSA SMS data, of a carrier-wide pattern of extreme driving misconduct that Nova failed to correct. That pattern included a reckless driving conviction in Virginia in March 2025 carrying a severity weight of 10; ten citations for speeding 15 or more miles per hour over the posted speed limit, each at maximum severity weight; eleven citations for hand-held cell phone use while operating a CMV, each at severity weight 10; a fatigue violation in January 2026 – just

five weeks before the crash – in which a Nova driver was placed out of service for operating a CMV while ill or fatigued; and two separate instances of Nova drivers operating CMVs under the influence of drugs within a seven-month span, each carrying a severity weight of 10. Nova received direct notice of each of these violations and retained and continued to dispatch the offending drivers without demonstrable corrective action;

301. *Negligent Supervision:* Failing to monitor, supervise, and correct the driving and vehicle maintenance conduct of its fleet despite continuous access to FMCSA SMS data and direct receipt of enforcement inspection reports reflecting 769 total violations across all BASICs in the 24-month measurement period – including pervasive failures in vehicle maintenance, controlled substances compliance, and unsafe driving – and despite Nova's own prior involuntary revocation of operating authority by the FMCSA in 2015, which placed Nova on notice of its obligation to maintain rigorous regulatory compliance. Nova's failure to implement any demonstrable corrective action in response to this cumulative and unambiguous record of fleet-wide noncompliance constitutes negligent supervision at the corporate level;

302. *Negligent Training:* Failing to adequately train Defendant Saldivar in the safe operation of a commercial motor vehicle in adverse winter weather conditions, including speed management on icy roadways, hazard perception and emergency response in active collision environments, and braking techniques for loaded tractor-trailers on ice and snow – deficiencies made foreseeable by Nova's documented carrier-wide tolerance of extreme speeding, reckless driving, distracted driving, and fatigue violations that its supervisory and training programs failed to prevent or correct;

303. *Negligent Policies and Safety Management:* Failing to establish, implement, enforce, or maintain adequate safety policies governing speed management, driver fitness, controlled substances compliance, vehicle maintenance, and emergency hazard response in a manner consistent with the FMCSRs and the standard of care applicable to commercial motor carriers – failures confirmed by the breadth and persistence of Nova's violation history across every BASIC category, including a controlled substances and alcohol program so deficient that Nova drivers were found operating CMVs under the influence of drugs on two separate occasions within seven months and in possession of alcohol while on duty on two additional occasions, without demonstrable fleet-wide remediation;

304. *Failure to Render Aid:* Failing to ensure, through policy, training, or direct instruction, that its driver Defendant Saldivar rendered assistance to the occupants of vehicles involved in a crash caused by Saldivar's own negligence – leaving a dying John H. Lengyel and his physically injured, traumatized wife Sharon K. Lengyel without aid for nearly thirty minutes – in violation of the general duty of care owed to crash victims; and

305. *Failure to Conduct Mandatory Post-Crash Drug and Alcohol Testing:* Failing to ensure that Defendant Saldivar was tested for alcohol within eight hours and for controlled substances within thirty-two hours of the fatal crash, as required by 49 C.F.R. § 382.303(a). The investigating officer's crash report reflects that no alcohol test and no drug test was performed on Saldivar. This failure is particularly significant given Nova's documented history of controlled substances violations – including two instances of Nova drivers operating CMVs under the influence of drugs in the fifteen months preceding the crash – and supports an adverse inference that the results of such testing would have been unfavorable to Nova;

306. *Spoliation of Material Evidence:* Causing or permitting the Nova CMV to be driven from the crash scene in Uinta County, Wyoming to its facility in Illinois before any ECM or EDR download was performed – a distance of hundreds of miles during which the pre-crash operational data recording Saldivar's speed, braking inputs, throttle position, and other critical parameters was overwritten and permanently destroyed – at a time when Nova's duty to preserve that evidence was unambiguous and immediate, and when the objective data on that ECM was the only means by which Plaintiff could independently verify what Nova's driver was doing in the moments before he drove into the side of the Silverado and crushed John H. Lengyel to death.

**Causation and Damages**

307. The negligence of Defendants Nova, Allectus, Gladius, and Saldivar was a direct and proximate cause of the death of John H. Lengyel and the serious physical and emotional injuries sustained by Sharon K. Lengyel. It was the Nova CMV – drawn from a fleet operating with a Vehicle Out-of-Service rate 31% above the national average, dispatched by a carrier whose drivers had been found operating under the influence of drugs twice in the preceding fifteen months – that struck the driver's side of the Silverado with the force necessary to eject John H. Lengyel and crush him to death before his wife's eyes. It was Saldivar's and Nova's failure to render aid that left Sharon K. Lengyel – physically injured, in shock, and alone – at the scene of her husband's death for nearly thirty minutes. And it was Nova's post-crash decision to drive the CMV hundreds of miles before preserving its ECM and EDR data that permanently deprived Plaintiff of the only objective record of what Saldivar did in the moments before impact.

308. As a direct and proximate result of the negligence of Defendants Nova, Allectus, Gladius, and Saldivar, Plaintiff Sharon K. Lengyel, individually and as wrongful death

representative of John H. Lengyel, has suffered damages including wrongful death, loss of consortium, serious personal physical injuries, severe emotional distress, and all other damages recoverable under Wyoming law, in amounts to be proven at trial.

**COUNT XV – PUNITIVE DAMAGES OF DEFENDANTS NOVA & SALDIVAR**

309. The conduct of Defendants Nova, Allectus, Gladius, and Saldivar described herein warrants the imposition of punitive damages on multiple independent and cumulative grounds. Nova is a carrier operating 1,427 power units and reporting nearly 19 million miles annually – a carrier of sufficient size and sophistication to know its regulatory obligations and to have the resources to meet them. It did not.

310. Nova dispatched Defendant Saldivar onto Interstate 80 in documented winter conditions at the wheel of a CMV drawn from a fleet generating a Vehicle Out-of-Service rate of 30.4% - nearly one defective vehicle for every three inspected – including 82 or more tire-related out-of-service orders and 13 out-of-service orders for brakes so deficient that 20% or more of the vehicle's service brakes were inoperative. On a roadway covered in ice and frost, Nova sent Saldivar into traffic in a vehicle whose fleet-mates had been repeatedly ordered off the road for the very mechanical deficiencies most likely to cause a loss of control or inability to stop.

311. Nova's driver safety record is not that of a carrier making good-faith efforts to comply. Its drivers were cited for reckless driving. They were cited eleven times for hand-held cell phone use at the wheel of an 80,000-pound commercial vehicle. They were cited ten times for speeding 15 or more miles per hour over the posted limit – the most extreme speeding category. They were found operating CMVs under the influence of drugs on two separate occasions within seven months. They were found in possession of alcohol while on duty on two additional

occasions. A Nova driver was placed out of service for operating while ill or fatigued just five weeks before this crash. Nova received direct notice of every one of these violations and dispatched its drivers again without demonstrable corrective action.

312. Following the crash – in which Saldivar's negligence ejected and crushed a man to death before his wife's eyes – Nova failed to ensure that Saldivar was tested for drugs and alcohol as federal law requires, depriving Plaintiff of evidence of whether its driver was impaired. Nova then caused or permitted the Nova CMV to be driven hundreds of miles back to Illinois before its ECM and EDR data was preserved – destroying the only objective record of Saldivar's pre-crash conduct at a time when Nova's preservation obligation was beyond dispute.

313. Taken together – the systemic maintenance failures, the pattern of extreme driving misconduct, the controlled substances violations, the failure to test after a fatal crash, and the post-crash destruction of material evidence – Nova's conduct reflects not inadvertence, not isolated human error, but a carrier-level, institutional indifference to the safety, rights, and lives of the people sharing the road with its drivers. That indifference killed John H. Lengyel in front of his wife and left her injured and alone in the wreckage. It constitutes willful and wanton misconduct for which punitive damages are not only appropriate but demanded under Wyoming law.

**COUNT XVI – DIRECT NEGLIGENCE OF DEFENDANT WALMART**

**(against Defendant Walmart)**

314. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

315. At all times relevant to this action, Defendant Smith was an employee and/or agent and/or statutory employee of Defendant Walmart and was operating the Walmart CMV within the

course and scope of that employment and agency. Defendant Walmart is vicariously liable for the negligent acts and omissions of Defendant Smith. Plaintiff pleads this count of direct negligence against Walmart separately and in addition to, not in lieu of, vicarious liability.

**Smith's Negligent Operation Revisited**

316. As described above, Defendant Smith was negligent in the operation of the Walmart CMV in the following respects, among others:

1. Operating the Walmart CMV at an unsafe and excessive speed for the conditions present: active snowfall, ice and frost on the roadway, and an active and obvious multi-vehicle collision sequence ahead that had already obstructed both westbound travel lanes of Interstate 80;
2. Failing to perceive, or failing to respond to, the plainly visible hazards ahead, including the jackknifed Origin CMV blocking both westbound lanes and the wreckage of the initial collision sequence, at a time when adequate perception and response would have resulted in a reduction in speed or evasive action sufficient to avoid or materially mitigate the impact with the Origin CMV;
3. Failing to exercise extreme caution or, where necessary, to stop the Walmart CMV upon encountering hazardous conditions on the roadway, as required by 49 C.F.R. § 392.14, which mandates that a driver operating a CMV on any road that has become hazardous due to snow, ice, or other adverse conditions must exercise extreme caution, and must stop the vehicle when conditions become sufficiently dangerous to make continued operation unsafe;

4. Proceeding through an active crash scene on an icy interstate at a speed that caused the Walmart CMV to crash through the jackknifed Origin CMV, notwithstanding that the hazardous road conditions and obstructed lanes ahead were open, obvious, and demanded an immediate and material reduction in speed or a full stop; and

5. Failing to render any aid to John H. Lengyel or to Sharon K. Lengyel following the crash, leaving Sharon K. Lengyel physically injured, in shock, and without assistance for the nearly thirty minutes that elapsed before emergency medical services arrived.

**Walmart's Direct Negligence**

317. Defendant Walmart was independently and directly negligent in the following respects, among others:

318. *Negligent Training:* Failing to adequately train Defendant Smith in the requirements and application of 49 C.F.R. § 392.14, which imposes a duty on CMV drivers to exercise extreme caution when hazardous conditions exist and to stop the vehicle when those conditions make continued operation unsafe. A commercial motor carrier of Walmart Transportation's size, sophistication and resources bears an obligation to ensure that its drivers understand and apply the extreme caution standard mandated by 49 C.F.R. § 392.14 – particularly when dispatching drivers onto Interstate 80 through Wyoming in winter conditions that foreseeably include ice, snow, reduced visibility, and the type of chain-reaction crash sequences that icy conditions on that corridor routinely produce. Defendant Smith's failure to exercise extreme caution, or to stop, upon encountering an active, obstructed crash scene on an icy interstate

demonstrates that Walmart's training program failed to equip him with the knowledge, judgment, or habit of compliance that § 392.14 demands;

319. *Negligent Supervision:* Failing to monitor, supervise, and ensure that Defendant Smith operated the Walmart CMV in compliance with 49 C.F.R. § 392.14 and the broader standard of care applicable to commercial motor vehicle operations in adverse winter conditions. Walmart Transportation dispatched smith onto Interstate 80 in winter weather conditions without implementing adequate supervisory systems to ensure that its driver reduced speed, exercised extreme caution, and stopped if necessary upon encountering the hazardous conditions and active obstructions present at the time of the crash. Walmart's failure to supervise Smith's compliance with § 392.14 in conditions that foreseeably demanded its application constitutes negligent supervision.

**Causation and Damages**

320. The negligence of Defendant Walmart and Smith was a direct and proximate cause of the collision that resulted in the death of John H. Lengyel and the serious physical and emotional injuries sustained by Sharon K. Lengyel. Had Defendant Smith exercised the extreme caution required by 49 C.F.R. § 392.14, or stopped the Walmart CMV upon encountering hazardous conditions and an active crash scene ahead, the Walmart CMV would not have crashed into the jackknifed Origin CMV propelling the Lengyels' vehicle directly into the path of the Nova CMV.

321. As a direct and proximate result of the negligence of Defendants Walmart and Smith, Plaintiff Sharon K. Lengyel, individually and as wrongful death representative of John H. Lengyel, has suffered damages including wrongful death, loss of consortium, serious physical

injuries, severe emotional distress, and all other damages recoverable under Wyoming law, in amounts to be proven at trial.

**COUNT XVII – PUNITIVE DAMAGES OF DEFENDANTS WALMART & SMITH**

322. The conduct of Defendant Walmart described herein warrants the imposition of punitive damages. Walmart is among the largest private motor carriers in the United States, a carrier with the financial resources, operational infrastructure, and regulatory sophistication to know its obligations under the Federal Motor Carrier Safety Regulations and to build training and supervisory programs that ensure its drivers comply with them. The duty imposed by 40 C.F.R. § 392.14 is not obscure or technical: it is a foundational rule of commercial driving that every qualified CMV operator is required to know, and that every responsible motor carrier is required to teach, reinforce, and enforce.

323. Defendant Smith's operation of a loaded commercial motor vehicle at an unsafe speed into an active crash scene on an icy Wyoming interstate, without exercising extreme caution and without stopping as § 392.14 required, was not the product of a split-second misjudgment in an unforeseeable situation. The hazardous conditions on Interstate 80 on February 18, 2026 were open and obvious: it was snowing, the roadway was covered in ice and frost, the speed limit had been reduced by variable speed limit signs, and the collision sequences ahead had already brought traffic to a stop and blocked both westbound travel lanes. In those conditions, § 392.14 did not merely permit Smith to stop – it required him to. He did not.

324. Walmart's failure to train Smith to understand and apply § 392.14 in exactly those condition, and its failure to supervise his compliance with that requirement on a dispatch that placed him on one of the nation's most notoriously dangerous winter driving corridors, reflects a

corporate indifference to driver training and regulatory compliance that is incompatible with the size, resources, and public responsibility of a carrier operating at Walmart's scale. That indifference, expressed through the conduct of a driver whose actions exacerbated an already catastrophic crash scene by blasting through the jackknifed Origin CMV, which launched the Lengyels into the path of the Nova CMV. This all rises to the level of willful and wanton misconduct for which punitive damages are appropriate and warranted under Wyoming law.

**COUNT XVIII – SPOLIATION OF EVIDENCE**

**(against Defendants Nova and Saldivar)**

325. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as through fully set forth herein.

326. At the time of the crash on February 18, 2026, Defendants Nova and Saldivar were in exclusive possession and control of the Nova CMV and all data stored within its ECM and EDR systems.

327. Defendants Nova and Saldivar knew, or reasonably should have known, immediately following the fatal crash, that litigation arising from the collision was reasonably foreseeable and that the ECM and EDR data stored on the Nova CMV constituted material evidence relevant to the impeding litigation.

328. The duty to preserve that evidence arose at the time of the crash, if not before, and attach to Defendants Nova and Saldivar by virtue of their ownership, operation, and control of the Nova CMV and their direct involvement in the fatal collision.

329. Defendants Nova and Saldivar breached that duty by causing or permitting the Nova CMV to be driven from Wyoming to Illinois before any ECM or EDR download was

performed, thereby allowing the pre-crash operational data stored on the vehicle to be overwritten and permanently destroyed.

330. The ECM and EDR data that was destroyed was not cumulative or collateral. It was direct, objective, machine-generated evidence of the Nova CMV's speed, braking inputs, throttle application, and other operational parameters in the critical seconds before impact – evidence that cannot be reconstructed, recreated, or obtained from any other source.

331. Plaintiff has suffered actual prejudice as a result of the destruction of this evidence. The loss of the Nova CMV's ECM and EDR data has permanently impaired Plaintiff's ability to establish the full extent of Defendant Saldivar's excessive speed and failure to brake, and to quantify Nova's systemic failure to ensure its driver operated safely under the conditions present on February 18, 2026.

332. The spoliation of the Nova CMV's ECM and EDR data was either intentional – reflecting a deliberate decision to move the vehicle before data was preserved – or, at minimum, the product of gross indifference to Defendants' preservation obligations, in circumstances where those obligations were or should have been obvious to any commercial motor carrier involved in a fatal crash.

333. As a direct result of Defendants Nova's and Saldivar's spoliation of material evidence, Plaintiff is entitled to all available remedies under applicable law, including but not limited to: (a) an adverse inference instruction at trial that the destroyed ECM and EDR data would have been unfavorable to Defendants Nova and Saldivar; (b) sanctions as the Court deems appropriate; and (c) such other and further relief as the Court may award to remedy the prejudice caused by Defendants' destruction of evidence.

**COUNT XIV – SPOLIATION OF EVIDENCE**

**(Against Defendant Walmart)**

334. The spoliation of evidence in this case is not limited to Nova's post-crash relocation of the Nova CMV before ECM and EDR data was preserved. Upon information and belief, Defendant Walmart independently contributed to the destruction, alteration, or degradation of material physical evidence by causing or arranging an expert inspection of the Nova CMV without notice to Plaintiff, co-defendants, or their respective experts.

335. Defendant Walmart knew, or reasonably should have known, at the time they arranged and conducted the inspection of the Nova CMV, that: (a) the Nova CMV was the vehicle directly responsible for the ejection and crushing death of John H. Lengyel; (b) the physical condition of the Nova CMV – including its braking system, tires, suspension, and other mechanical systems – was material evidence directly relevant to Plaintiff's claims and to cross-claims among defendants; (c) litigation arising from the crash was not merely foreseeable but was imminent; and (d) an ex parte inspection of the vehicle without notice to adverse parties and their experts was inconsistent with Walmart's preservation obligations and with the requirements of fair litigation.

336. Notwithstanding that knowledge, Defendant Walmart caused or permitted the inspection to proceed without notice, without affording other parties an opportunity to attend, and without disclosing the inspection, its scope, or its findings through any formal channel prior to Plaintiff becoming aware of it through informal means.

337. To the extent the Walmart inspection altered, consumed, disturbed, or degraded any physical evidence on the Nova CMV that was material to Plaintiff's claims – whether through component removal, physical testing, sample collection, or otherwise – Plaintiff has suffered

prejudice that cannot be remedied by after-the-fact disclosure of Walmart's expert's findings alone, because Plaintiff was denied the opportunity to observe, document, and respond to the condition of the vehicle at the time the inspection was conducted.

338. The conduct of Defendant Walmart in arranging and conducting an ex parte inspection of the Nova CMV without notice to Plaintiff or other parties constitutes spoliation of material evidence, either independently or in combination with Nova's prior relocation of the vehicle before ECM and EDR data was preserved, and entitles Plaintiff to all available remedies including adverse inference instructions, sanctions under Federal Rule of Civil Procedure 37, and such other relief as the Court deems appropriate to remedy the prejudice caused by Walmart's conduct.

## DAMAGES

339. Plaintiff incorporates by reference and re-alleges every other paragraph as if restated verbatim.

340. Plaintiff seeks all damages permitted under Wyoming law, including wrongful death damages, loss of care, comfort and society, lost earnings and services, and other economic and non-economic damages.

341. Additionally, as a direct and proximate result of the negligent, and/or reckless, willful, wanton conduct by all Defendants, Plaintiff Sharon K. Lengyel suffered severe injuries, losses and harms.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, individually and jointly and severally, as follows:

1. For compensatory damages in an amount exceeding $75,000, exclusive of interest and costs, in an amount to be specifically proven at trial;

2. Punitive damages available under the laws of the State of Wyoming;

3. Exemplary damages because the Defendants acted recklessly and/or willfully and wantonly;

4. For costs of suit incurred herein;

5. Pain, suffering and emotional distress, past and future;

6. Loss of earnings and earning capacity, past and future;

7. Loss of enjoyment of life, past and future;

8. Medical expenses, past and future, including the cost of care, which can reasonably be expected to be incurred in the future in an amount to be set forth at trial;

9. Disability and disfigurement;

10. Exemplary damages as a result of the reckless, willful, and wanton acts and omissions of the Defendants;

11. Costs of this action, and such other damages as are fair and just.

12. For interest and any further relief as the Court deems just and proper.

**JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL**

Plaintiffs request that this matter be tried to a jury in Cheyenne, Wyoming.

Dated this 7th day of July, 2026.

/s/ *Grant H. Lawson*

Grant H. Lawson WSB # 6-4260
Joseph Chenchar WSB #7-5576
THE LAW FIRM FOR TRUCK SAFETY, LLP
1551 Three Crowns Drive, Suite 100
Casper, Wyoming 82604
grant@truckaccidents.com
jchenchar@truckaccidents.com

*Attorneys for Plaintiff*